RUTH TAXY *et al.*, Plaintiffs-Appellants, v. JULIA WORDEN *et al.*, Defendants-Appellees.

First District (3rd Division)   Nos. 1—87—0583, 1—87—2333, 1—87—2686 cons.

Opinion filed March 22, 1989.

Davis, Barnhill & Galland and Sidley & Austin, both of Chicago (George F. Galland, Jr., and Lee J. Schwartz, of counsel), for appellants.

Winston & Strawn, of Chicago (Dan K. Webb, Steven F. Molo, and George C. Lombardi, of counsel), for appellees.

JUSTICE RIZZI delivered the opinion of the court:

Plaintiff-appellant Donald G. Worden appeals from a judgment of the circuit court of Cook County regarding the valuation of his stock in the three defendant corporations, Continental X-Ray Corporation, Alphatek Corporation and Allied Fabrication Corporation. Plaintiffs-appellants Ruth Taxy and CXR Corporation, in conjunction with plaintiff Worden, appeal from a judgment regarding the entry of a supervisory order and the appointment of a guardian *ad litem* with respect to the subject trust. On appeal, plaintiff Worden argues that the trial court committed crucial errors in the valuation proceedings of his shares in the three defendant corporations and that the resulting valuation was against the manifest weight of the evidence. Plaintiffs Worden, Taxy and CXR Corporation further argue that the trial court erred in (1) imposing a "supervisory order" requiring the various procedures be followed in the conduct of meetings of the subject trust and (2) appointing a guardian *ad litem* to protect the interest of "unborn heirs" of the trust and in awarding him attorney fees and costs. We affirm.

The three defendant corporations, Allied Fabricating, Alphatek and Continental X-Ray (collectively operating companies) are closely held corporations. Allied Fabricating is a sheet metal company, Alphatek manufactures X-ray processors and Continental X-Ray manufactures X-ray equipment. The principal shareholders, directors and officers in the operating companies were plaintiff Donald Worden (Donald) and defendants Julia Worden (Julia) and Patrick Fitzgerald (Fitzgerald).

Prior to 1987, the operating companies leased working premises from a fourth corporation, CXR Corporation (CXR). All four companies were founded by the now deceased J. Loyal Worden. Worden's will provided for the creation of the "J. Loyal Worden Testamentary Trust." The trust agreement provides that (1) life-long friend and business associate Ruth Taxy (Taxy) is the life beneficiary; (2) children

Donald and Julia are the remaindermen; and (3) Taxy, Donald and Julia are the trustees. The trust owns 45% of the shares of CXR and Taxy owns the remaining 55%.

Donald, Julia and Fitzgerald ran the operating companies following Loyal's death. Taxy was an officer and employee of the operating companies. In 1985, however, a dispute arose. Donald was relieved of his duties as an officer and employee of the operating companies and Taxy's association with the operating companies was terminated. Furthermore, Julia and Fitzgerald planned to move the operating companies out of the real estate owned by CXR.

On March 16, 1986, Donald, Taxy, CXR and the trust filed a lawsuit. The five-count amended complaint alleged that (1) the actions of Julia and Fitzgerald constituted a breach of the shareholders' agreement to run the companies on a joint basis; (2) the actions of Julia and Fitzgerald constituted a breach of their fiduciary duties; (3) Donald, Taxy, CXR and the trust were entitled to injunctive relief against certain imminent corporate actions soon to be carried out by Julia and Fitzgerald; (4) Donald, Taxy, CXR and the trust were entitled to a preliminary injunction maintaining Donald's and Ruth's status in the operating companies; and (5) injunctive relief, in the alternative, should be granted, thereby selling or dissolving the operating companies.

Following the testimony of expert appraisers and the introduction of other evidence, the trial court issued an order (1) requiring Donald to sell his shares in the operating companies back to those corporations; (2) setting an aggregated price of $876,000 for those shares and allowing interest on that price from November 25, 1986; (3) allowing the shares in Alphatek to be purchased through two future installment payments; and (4) refusing to allow Donald his expert appraiser's expenses. Further, the trial court issued an order both appointing a guardian *ad litem* for the unborn heirs of the trust and awarding the guardian $25,110.70 in attorney fees and costs. Finally, the trial court issued a supervisory order with respect to Donald, Taxy and CXR entering and continuing the guardian *ad litem*'s petition for the appointment of a substitute trustee and governing the conduct of any trustee meetings held by Donald, Julia and Taxy. This appeal followed.

Donald first argues that the trial court committed error in its valuation proceedings and that its valuation was clearly erroneous. To support this conclusion, Donald asserts that (1) the value the trial court reached was too low; (2) the trial court erred in appointing William McMillian, the court-appointed appraiser; (3) the trial court should not have allowed installment payments for his shares in Alpha-

tek; (4) the trial court deprived him of eight months' interest required by statute; and (5) the trial court erred in denying him expert witness expenses.

The Illinois Business Corporation Act provides:

"(a) In either an action for dissolution *** or in an action which alleges the grounds for dissolution *** but which does not seek dissolution, the Circuit Court, in lieu of dismissing the action of ordering dissolution, may retain jurisdiction and:

(1) Appoint a provisional director;

(2) Appoint a custodian; or

(3) In an action by a shareholder, order a purchase of the complaining shareholder's shares as provided in subsections (f) and (g) below.

* * *

(g) Either the corporation or any shareholder or group of shareholders may, any time after the filing of an action for dissolution ***, petition the court to purchase the shares of a complaining shareholder and, unless the court finds such procedure to be inequitable, *the court shall determine the fair value of the shares* as of such date as the court finds equitable. In so doing, the court shall follow the procedures set forth for appraisal of shares under Section 11.70 and shall thereafter dismiss the action." (Emphasis added.) Ill. Rev. Stat. 1987, ch. 32, par. 12.55.

■ We initially note that the term "fair value" is not defined in the statutes. Furthermore, case law on this issue clearly establishes that no precise and exact rules for determining the fair market value of stock exists. Instead, "fair value" is determined by an exercise of the court's judgment after consideration of all relevant factors. *Ahlenius v. Bunn & Humphreys, Inc.* (1934), 358 Ill. 155, 168, 192 N.E. 824, 829. As delineated in *Stewart v. D.J. Stewart & Co.* (1976), 37 Ill. App. 3d 848, 346 N.E.2d 475, relevant factors may include:

"(a) The nature of the business and the history of the enterprise from its inception.

(b) The economic outlook in general and the condition and outlook of the specific industry in particular.

(c) The book value of the stock and the financial condition of the business.

(d) The earning capacity of the company.

(e) The dividend-paying capacity.

(f) Whether or not the enterprise has goodwill or other intangible value.

(g) Sales of the stock and the size of the block of stock to be valued.

(h) The market price of stocks of corporations engaged in the same or a similar line of business having their stocks actively traded in a free and open market, either on an exchange or over-the-counter." (37 Ill. App. 3d at 856, 346 N.E.2d at 481.)

Finally, the importance and weight given to each of these factors rests within the discretion of the trial court under the circumstances of each case. 37 Ill. App. 3d at 856, 346 N.E.2d at 481; see also *Independence Tube Corp. v. Levine* (1988), 178 Ill. App. 3d 282.

The record indicates that, at trial, evidence was introduced as to the value of Donald's stock. William G. McMillian, the court-appointed appraiser, testified as to his opinion of the value of the stock. McMillian stated that there are basically three accepted methods of valuing the shares of a corporation. The first method, the liquidation method, bases the value of the stock on the premise that the corporation is being liquidated. McMillian rejected this method as inappropriate and inaccurate because, not only were the operating companies not being liquidated, but the value of companies being liquidated, as a whole, is greater than the value of their liquidated assets. The second method, the income method, was also rejected. This method bases the value of a corporation upon a projection of earnings into the future. This method would produce an inaccurate valuation because the operating companies had not in the past done the type of forecasting on which this analysis depended and the earnings of the operating companies had been too erratic in the past. The third method, the comparable or market approach, was the method used by McMillian. With this method, the value of the operating companies was based upon the "price earnings ratio of comparable public companies." This method requires a working knowledge of operations and conditions of the company being valued as well as a knowledge of the price-to-earnings ratio of comparable companies.

McMillian testified that in arriving at the value of Donald's stock, he took a weighted average of earnings over several years and gave the greatest weight to the most recent years. He then multiplied the weighted earnings by the price-to-earnings ratio. After this calculation and method was applied to the operating companies, McMillian arrived at the following valuation: $156,888 for Continental stock; $173,350 for Alphatek stock and $77,946 for Allied Fabricating stock. Therefore, according to McMillian, the total value of Donald's stock was $408,184.

Donald also offered the testimony of his own expert appraiser, William Raidt. Unlike McMillian, Raidt used the income method. According to Raidt, the principle approach within the income method is the direct capitalization method, which is based on the current year's or most recently reported year's actual financial performance, capitalized at a multiple selected in recognition of the historic pattern of growth of the companies. Raidt did not take into consideration the salaries paid to Donald, Fitzgerald, Julia and Paul Kupsco, another officer of the corporation. However, Raidt stated that not expensing the salaries of officers is tantamount to assuming that those officers do not exist as far as salary expense is concerned. This also substantially increased the value of the companies.

After several other calculations, Raidt arrived at a "primary earnings" figure and a "compound annual growth rate" for primary earnings; he then multiplied the "primary earnings" by the compound annual growth rate of "primary earnings." This calculation was done for the year of 1985 as opposed to a weighted average of several years. This "primary earnings" calculation, according to Raidt, resulted in the "fair market value of the equity." Finally, in reaching his valuation of Donald's stock, Raidt took into consideration an alleged "pact of unanimity" between Donald, Fitzgerald and Julia wherein all actions would be taken by unanimous approval of the three regardless of the size of their respective interests in the companies. The sum reached by Raidt of $1,789,586 represented Donald's combined interest in the operating companies, that is, $1,132,364 for Continental, $486,101 for Alphatek and $171,111 for Allied Fabricating. Raidt also gave a lower figure of $1,659,380, representing the reduction of Kupsco's interest on a *pro rata* share basis and a reallocation of the difference among the interest of Donald, Julia and Fitzgerald.

■ Following the introduction of this evidence, the trial court concluded that the value of Donald's stock in the three corporations was $876,000. The trial court arrived at this value by considering all relevant evidence presented by the experts. In fact, the trial court stated:

> "The valuation of an interest in a close corporation is not an exact science, but involves many subjective and complex determinations. In a somewhat related area, it should be noted that the Internal Revenue Service recognizes that no general formula is established but that where market quotations are not available, all financial data as well as all relevant factors must be considered in reaching the fair value of stock for estate tax and gift tax purposes.

\* \* \*

The respective weight to be given the various factors is particularly a matter for the trial judge under the circumstances."

The court continued by delineating the three principal disputes between the parties. First of all, with respect to the alleged "pact of unanimity," the trial court concluded that although the evidence indicated that Donald, Julia and Fitzgerald generally discussed and made policy decisions together, such actions were not unusual in closely held corporations. The court stated that it did not find that such a pact of unanimity existed or that even if one did, it could forever bind the parties. Secondly, with respect to the valuation of the stock wherein Donald's appraiser included the salaries of Donald, Julia and Fitzgerald in their entirety as a part of the profits of the corporations, the court noted that if it were to include the salaries as part of the profits of the corporations, it would have to find that Donald, Fitzgerald and Julia performed absolutely no duties as executives of the corporations, when the evidence was clearly to the contrary. Moreover, such a conclusion falsely increased the value of the various corporations. The court gave no weight to the dividends or the lack thereof in light of the fact that close corporations seldom declare dividends, thus making this factor bear little practical effect upon the valuation of a corporation.

Finally, the court noted that although Donald was the son of the founder and performed viable services for the companies, it did not consider Donald's expectation of continued employment with the companies a valid factor in determining the value of his shares in that it did not believe that Donald had any vested or absolute right to a continuation of his employment, an enhanced salary or increased or enhanced perquisites.

Based upon this, we cannot say the trial court's valuation of the stock was in error. The trial court was equipped with adequate information upon which to base its appraisal. The trial court weighed the testimony of the independent court appraiser against the testimony presented by plaintiff's appraiser. The trial court also reviewed extensive documentation and exhibits revealing the value and worth of the companies involved. We therefore conclude that the trial court's valuation reflects careful consideration of all the evidence presented and that its judgment was not against the manifest weight of the evidence thereby requiring reversal.

■ Donald next argues that the trial court erred in appointing McMillian as the appraiser. It is Donald's position that McMillian acted as an expert witness for the appellees rather than as an inde-

pendent appraiser. Donald further argues that McMillian's appointment was improper because McMillian had, in the past, worked for a company in which a partner of the law firm retained by the appellees had stock. We disagree.

Section 11.70(f) of the Business Corporation Act clearly provides:

"(f) The jurisdiction of the court in which the proceeding is commenced *** is plenary and exclusive. *The court may appoint one or more persons as appraisers to receive evidence and recommend decision on the question of fair value.*" (Emphasis added.) (Ill. Rev. Stat. 1987, ch. 32, par. 11.70(f).)

Nothing in the record indicates that McMillian acted as an expert for the appellees and not as an independent appraiser. In arriving at his valuation, McMillian gathered information, independent of any influence from either of the parties, and applied that information to the theory that his research indicated would give the most fair and accurate valuation of Donald's stock. Donald has not directed us to any evidence to the contrary. Moreover, the record indicates that (1) McMillian never discussed this case with the partner of appellees' firm; (2) the partner was in no way involved in this case; and (3) McMillian's affiliation with the company in which the partner had an interest ended three years prior to the inception of this case. Accordingly, we find that the trial court properly appointed McMillian to serve as the appraiser and that no impropriety existed in that appointment.

■ Donald further argues that the court erred in allowing installment payments to Donald for his stock in Alphatek. Section 12.55(f) allows for the shareholder to receive payment for his stock in "cash or in installments." (Ill. Rev. Stat. 1987, ch. 32, par. 12.55(f).) This procedure applies in instances where the shareholder is seeking to be brought out. Section 12.55 is silent as to whether installment payments are permissible when the corporation is seeking the buyout. However, section 12.55 gives the trial court discretion to act in a manner deemed equitable in conducting valuation proceedings. Donald does not adequately demonstrate that he has been prejudiced by the allowance of installment payments or that the trial judge abused his discretion and acted inequitably in allowing such. Accordingly, the trial court's decision will not be disturbed.

■ We furthermore find that the trial court did not err in allowing statutory interest from the judgment date of November 25, 1986. Donald argues that section 12.55(g) of the Business Corporation Act (BCA) adopts the procedure of section 11.70(g) of the BCA, which provides that the court's judgment valuing the shares "shall include an allowance for interest ***, from the date on which the corporate

action giving rise to the right to dissent is approved to the date of payment." (Ill. Rev. Stat. 1987, ch. 32, par. 11.70(g).) Therefore, we should hold that interest in a section 12.55(g) proceeding runs from the date of the event giving the corporation the right to purchase the shares to the date of payment. We disagree.

Section 11.70(g), upon which Donald relies, provides for the payment of interest from the date on which corporate action giving rise to the dissent is approved. It applies in proceedings commenced by a shareholder exercising his right to dissent and compelling a corporation to purchase his shares. (Ill. Rev. Stat. 1987, ch. 32, par. 11.70(g).) A shareholder's right to dissent comes into existence following the occurrence of one of several corporate actions delineated in section 11.65 of the BCA. (Ill. Rev. Stat. 1987, ch. 32, par. 11.65.) A section 12.55(g) proceeding, on the other hand, is commenced by a corporation upon the occurrence of an event giving the corporation the right to compel the shareholder to sell his shares. Section 12.55 makes reference to various sections of 11.70 merely for identifying the manner in which proceedings for the appraisal of shares are to be conducted.

As Donald correctly argues, section 11.70(g) presupposes that (1) the dissenting shareholder sought the buyout and (2) an adjudication of a right to dissent occurred and a precise date giving rise to that right can be determined. However, neither of these events occurred in the instant case. The statutes are clear as to the different procedures to be followed when a corporation seeks to buy out a shareholder and when a shareholder seeks to be brought out by a corporation. We believe that if the legislature had intended for the same procedure to be applied when a corporation seeks a buyout as when a shareholder seeks to be bought out, it would have clearly stated such. Accordingly, we find that the trial court properly allowed Donald interest only from the date of judgment.

■ We further find that the trial court did not err in denying Donald fees for his expert appraiser. Section 11.70(h) of the Business Corporation Act provides:

> "The court, in an appraisal proceeding commenced under subsection (e), shall determine all costs of the proceeding, including the reasonable compensation and expenses of the appraisers, if any, and experts employed by any party, but shall exclude the fees and expenses of counsel for any party. If the fair value of the shares as determined by the court materially exceeds the amount which the corporation offered to pay for those shares, or if no offer was made, then all or any part of such expenses *may* be assessed against the corporation." (Emphasis added.)

Ill. Rev. Stat. 1987, ch. 32, par. 11.70(h).

The allowance of appraiser fees in this instance is discretionary, not mandatory. The statute clearly states that "expenses may be assessed." (Ill. Rev. Stat. 1987, ch. 32, par. 11.70(h).) In the case at bar, the court clearly informed the parties that an independent court appraiser would be appointed and that the operating companies would bear the cost of that appraiser's fees. It further informed the parties that if any party desired to hire an additional appraiser, each party would have to bear that expense. In fact, the court stated:

"The cost of the appraisal will be borne by the petitioning shareholders. In the event that either dissent or majority shareholders wish to appoint or select independent appraisers, they have a right to do so; however, that will be at their cost."

At no time did Donald object to the court's statement or move the court for clarification. Therefore, we conclude that Donald was well aware of the fact that he would have to bear the expenses of an additional appraiser and will not now be allowed to request that he be granted fees for such.

Next, Donald, Taxy and CXR (collectively plaintiffs) argue that the court erred in entering the "supervisory order." Plaintiffs argue that the supervisory order caused plaintiffs Worden and Taxy to (1) administer the trust in a manner at variance with the trust instrument and (2) open CXR Corporation's records to inspection by a non-shareholder and hostile litigant. We disagree.

■ Absent proof of fraud, abuse of discretion or bad faith, a trustee's exercise of discretion is not subject to interference by the court. Thus, a court is not in the position to substitute its judgment for that of the trustee if the trustee's acts are within the bounds of reasonable judgment. (*Flanagan State Bank v. BroMenn Healthcare* (1986), 140 Ill. App. 3d 137, 150, 487 N.E.2d 1180, 1188.) However, this does not mean that a trust or trustee is not subject to supervision by the courts. This is so even if a trust or other document provides that the instrument shall not be accountable to any court. (*In re Estate of Thomson* (1986), 139 Ill. App. 3d 930, 935, 487 N.E.2d 1193, 1197.) Moreover, "[w]here great discretion is vested in the trustee the exercise of such discretion is subject to the control of a court of chancery." *Maquire v. City of Macomb* (1920), 293 Ill. 441, 453, 127 N.E. 682, 687.

In the instant case, the order that plaintiffs object to provides:

"2. Pending further order of the court, all meetings of the trustees of the J. Loyal Worden Testamentary Trust shall proceed in the following fashion:

A. Meetings shall be held in or near Cook County, Illinois upon 5-day notice to all trustees accompanied by a proposed agenda of the meetings;

\* \* \*

C. The minutes of all meetings shall be transcribed by a Certified Shorthand Reporter, the cost of which shall be paid by the trust.

3. Julia Worden shall be given full and complete access to all trust documents and documents of CXR Corporation, for purposes of inspection and copying.

4. Julia Worden shall be included as a co-signator on all bank accounts of the trust.

5. All transactions and business which may effect [*sic*] the value of the trust estate shall be made or implemented only after a vote is taken at a meeting of the trustees at which the transaction or business decision was discussed."

■■ Contrary to plaintiffs' claims that this order causes them to administer the trust in variance with the trust agreement and opens up the company's books to a nonshareholder, it is clear that the only purpose of this order is to supervise the conduct of the trustees' meetings. The court, being well aware of the hostility between the parties as litigants and as trustees of the same trust, and in response to the guardian *ad litem*'s motion for a substitute trustee, was merely attempting to keep the same trustees in place as well as supervise the manner in which orderly business of the trust could be conducted. This order does not in any way dictate what the substance of the meeting should be or how business should be conducted. It merely takes notice of the fact that the trustees are in the midst of hostile litigation and that the trust will not benefit if some of the trustees attempt to freeze out one of the other trustees. In light of the administrative and ministerial nature of this order, we do not agree with plaintiffs that the trial court erred in entering this order.

Finally, plaintiffs argue that the trial court erred in appointing a guardian *ad litem* and in awarding him attorney fees and costs. Plaintiffs assert that there was no showing of the need for such an appointment and that no showing was made of how the guardian or his attorney's work benefited anyone. Plaintiffs conclude that, therefore, there should not have been an appointment or compensation resulting from the appointment. We disagree.

■■ ■ Section 2—501 of the Illinois Code of Civil Procedure allows for the appointment of a guardian *ad litem* (guardian) to represent the interest of unborn heirs. (Ill. Rev. Stat. 1987, ch. 110, par.

2—501.) The court is empowered to appoint a guardian whenever the court deems it "necessary for the proper and complete determination" of an unborn heir's future interest, legal or equitable, in any property, real or personal. (Ill. Rev. Stat. 1987, ch. 110, par. 2—501.) The court's power of appointment is discretionary and will not be overturned on review absent an abuse of that discretion.

██ In the instant case, the court, in appointing a guardian, was merely taking the necessary steps to protect and safeguard the interest of the unborn heirs of the J. Loyal Worden trust. (See *Gunnell v. Palmer* (1938), 370 Ill. 206, 211, 18 N.E.2d 202, 205-06.) It was clear to the court that a conflict of interest existed with respect to Julia. Julia was a trustee as well as an officer, director and shareholder of the operating companies. She was attempting to move the operating companies from the property that was owned by the trust. According to the other two trustees, Donald and Taxy, such a move would have been irreparably devastating to the company owned by the trust. To further complicate matters, Julia, Taxy and Donald were involved in hostile litigation regarding whether Taxy was properly relieved of her duties with the operating companies and whether Donald was receiving a "fair" price for his stock in the operating companies. In light of the obvious animosity between the parties, who were also trustees with vested personal interest in the outcome of the litigation, we cannot find that the trial court abused its discretion in appointing an impartial, disinterested person to represent the interest of the contingent beneficiaries of the trust and in awarding fees to the guardian as well as his attorney.

Accordingly, the judgment of the trial court is affirmed.

Affirmed.

McNAMARA and WHITE, JJ., concur.