THOMAS KALABOGIAS *et al.*, Plaintiffs-Appellees and Cross-Appellants, v. PETER GEORGOU *et al.*, Defendants-Appellants and Cross-Appellees.

First District (2nd Division)   No. 1—91—3486

Opinion filed September 14, 1993.

Donald L. Johnson, of Chicago, for appellants.

Carey, Filter, White & Boland, of Chicago (Edmund P. Boland and Michael J. Murray, of counsel), for appellees.

JUSTICE DiVITO delivered the opinion of the court:

Plaintiffs, brothers Thomas and George Kalabogias, 49% shareholders in the Contessa Main Street Corporation (the Corporation), brought an action against Peter and Mary Ann Georgou, 51% shareholders in the Corporation, Ethel Nagode, and the Corporation seek-

ing the Corporation's dissolution. Prior to trial, the circuit court granted the petition of the original defendants to purchase plaintiffs' stock as an alternative to dissolving the Corporation. Accordingly, a bench trial to determine the "fair value" of plaintiffs' shares was held, after which the court ordered the Corporation to purchase plaintiffs' 490,000 shares for $683,060. When the Corporation failed to comply with the court's order, plaintiffs sought judgment against the individual defendants. The court granted plaintiffs' motion, ordering Peter and Mary Ann Georgou (defendants) to purchase the shares for $683,060.

On appeal, defendants contend that (1) plaintiffs were precluded from bringing this suit in their individual capacity since relief could be obtained only through a shareholders' derivative suit; (2) the appraisal methodology employed by the circuit court was inappropriate under the Business Corporation Act of 1983 (Ill. Rev. Stat. 1985, ch. 32, par. 1.01 *et seq.* (now codified as 805 ILCS 5/1.01 *et seq.* (West 1992))) (Business Corporation Act); (3) a successor judge impermissibly altered the prior judge's ruling without first holding additional hearings; (4) their attorney's representation was ineffective; and (5) the doctrine of election of remedies precluded plaintiffs from seeking redress against them. In their cross-appeal, plaintiffs contend that the circuit court erred when it denied their request for punitive damages and prejudgment interest.

In 1980, the Kalabogias brothers and Peter Georgou jointly formed the Corporation and opened the Contessa Restaurant at 4820 West Main Street in Skokie, Illinois. Thereafter, over the course of several years, each plaintiff acquired 245,000 shares of the Corporation for $38,750. The remaining 510,000 shares were held by Peter and Mary Ann Georgou in joint tenancy. The board of directors of the Corporation was comprised of the four shareholders and Ethel Nagode, Mary Ann Georgou's mother.

In May 1985, Peter Georgou fired George Kalabogias from his job as a cook in the restaurant; Thomas Kalabogias left his position as a cook the following spring. Thereafter, the brothers filed a three-count complaint against the Corporation, the Georgous, and Nagode: count I sought an accounting and an injunction against alleged improper activities; count II sought a declaratory judgment that Nagode was not a duly qualified director; and count III sought either the dissolution of the Corporation or the entry of one of the alternative remedies to dissolution provided in section 12.55 of the Business Corporation Act. Ill. Rev. Stat. 1985, ch. 32, par. 12.55 (now codified, as amended, as 805 ILCS 5/12.55 (West 1992)).

Prior to trial and pursuant to section 12.55, both sides petitioned the court to order the purchase of plaintiffs' shares as an alternative to dissolving the corporation. On April 28, 1986, the circuit court granted "defendants' motion to continue the business of the corporation and purchase the shares of plaintiffs" and ordered the parties to employ appraisers to determine the value of the shares. Subsequently, the court set March 31, 1989, as the valuation date of the stock.

At the trial, it was established that Peter and Mary Ann Georgou "exclusively managed and conducted *** the financial affairs of the Corporation" and that the only responsibility of each plaintiff was to work in the kitchen at the restaurant. Peter Georgou testified that his practice in maintaining diaries of the restaurant's receipts was to note the total sales for each day and then subtract the money he determined was necessary for the restaurant's cash disbursements. He would then report the resulting figure as the gross sales in the corporate books and records. He explained that he maintained a similar diary for each year until 1986, but destroyed them after Thomas Kalabogias stole the 1983 diary from his office. He claimed that both plaintiffs knew of the diaries and that the extra money was divided evenly between the four shareholders after the payments of expenses were made. He stated that the Corporation's historical financial statements, including income tax forms, did not reflect actual sales, but instead were based on the computation placed in the diaries. He also stated that he maintained tight control over the guest checks by distributing them to the waitresses only as needed and by keeping a record of the number of checks used.

Plaintiffs testified that Peter Georgou controlled the restaurant's finances and that they had no knowledge of his underreporting the restaurant's sales. Thomas Kalabogias testified, however, that Peter Georgou often gave them cash payments of $50 or greater.

Attorney Daniel Pappas testified that he formerly represented plaintiffs and prior to his filing the instant lawsuit, defendants' attorney, Robert Fritzshall, told him that "[t]he only thing that [was] coming off the top [was] 17 percent." He understood the statement to mean that Peter Georgou was "skimming 17 percent off the top of the gross receipts." He also testified that when he was at a directors' meeting in November 1985, he observed Nagode signing some papers in the corporate minute book. When he asked what she was doing there, Fritzshall told him that she was the fifth director of the corporation. Pappas responded that all the corporate records he had observed indicated that the Board had only four directors and not five. Finally, he testified that the corporate records had been altered at

some point between the two times he reviewed them and that Fritzshall's secretary told him that she was instructed to make the alterations. In particular, he noticed that Ethel Nagode's and Mary Ann Georgou's names had been added to the minutes of the December 30, 1983, shareholders' meeting as directors who were present at the meeting.

James Harfield, a certified public accountant and valuation consultant with extensive experience in auditing and valuing restaurants, testified for plaintiffs that, in his opinion, approximately 23.6% of the gross revenue was underreported on the corporate tax records and financial statements. He based his conclusion on the 1983 diary, Georgou's trial and deposition testimony, the corporate records and financial statements, and statistics compiled by the National Restaurant Association for restaurants of similar style and size.

Harfield first determined that the "net book value" of the corporation based on the financial statements was $41,251, and then added $885,730 as an adjustment for the underreported earnings through March 31, 1989, reaching an "adjusted net book value" of $926,981. He then calculated that the unreported income would have earned an average of 9.33% compounded interest had it been deposited in the corporate account, providing $466,701 in lost interest payments. Adding the two figures together, he determined that the "final adjusted net book value" of the corporation on March 31, 1989, was $1,393,682, or $1.394 per share, and concluded that plaintiffs' 490,000 shares were worth $683,060. He then verified the accuracy of this result by conducting a "guest check analysis," wherein he multiplied the number of guest checks actually used by the restaurant by the average charge per check for a similar restaurant and compared that amount to the total reported gross sales. He determined that the average charge at the Contessa Restaurant was well below the national average. He also conducted a "cost of foods sold" analysis and determined that the Corporation's costs constituted 13% more of the reported sales than the national average.

Defendants called William Raidt, a professional appraiser, who testified that based on the financial statements of the Corporation, he believed it to be worth only $102,279. He arrived at this figure by deducting $39,340 in debt capital from $141,619 in assets. He stated, however, that in determining the Corporation's value, he "assume[d] that there [was] no other income or expense" than what appeared in the Corporation's financial statements.

On November 30, 1990, his last day on the bench, Judge Shields ordered, in pertinent part:

"H. That Peter Georgou and Mary Ann Georgou exercised sole and exclusive control over the financial affairs of the business and the Corporation. Tom Kalabogias and George Kalabogias were not involved in the financial affairs of the Corporation while employed or thereafter.

\* \* \*

K. The evidence establishes that Tom and George Kalabogias 1) had no involvement in the preparation of the financial statements or tax records of the restaurant, 2) had no involvement in providing any of the information reflected on the financial statements and tax records of the Corporation and 3) were not involved in the preparation of the sales tax and income tax returns for the Corporation \* \* \* or the maintenance or preparation of the records or documents purporting to reflect daily cash receipts and disbursements from the business of the Corporation, nor did they maintain any records regarding the revenues or cash receipts from the business of the Corporation.

\* \* \*

M. [A] daily diary personally and exclusively maintained by Peter Georgou, during 1983 indicates and convincingly establishes that the defendant Peter Georgou kept records of receipts separate and distinct from the financial data and balance sheets of the Corporation.

N. Analysis of the diary and a comparison with other financial data in evidence further establishes that, in 1983, Peter Georgou exploited the Corporation and apparently converted its funds and assets to his own use and benefit. The following specific fraudulent and unlawful acts were committed by Peter Georgou, as shown by the evidence;

(1) Kept and maintained false and fraudulent books of account purporting to reflect the actual gross receipts of the Corporation;

(2) Caused the accountants for the Corporation to record false and inaccurate entries of income and expense of the Corporation;

(3) Intentionally failed to properly report the actual income and proper expenses of the Corporation on Federal and State Income Tax Returns and Sales Tax Returns;

(4) Refused and continue to refuse to furnish Plaintiffs with an accurate account of all unreported income and expenses of the Corporation;

(5) Destroyed cash register tapes and other business records showing the actual gross receipts of said business on a daily basis;

(6) Destroyed all diaries and records of cash expenditures made in the course of the business, particularly those similar to [the 1983 diary] in other years.

O. That further evidence exists which indicates that the records of the Corporation, particularly the minute book thereof, have been inaccurately kept and reported, and that copies of waivers of notice of stockholders and directors meetings and minutes thereof have been changed, altered and otherwise in accurately [sic] prepared and circulated, which acts deprived plaintiffs of their rights and interests as stockholders and directors;

P. That Ethel Nagode was never properly or legally elected as a director of the Corporation although the Corporate records were illegally altered to reflect her purported election.

Q. That by reason of the foregoing acts, the individual defendants * * * have control of the subject corporation and exclusive control of its affairs, monies and properties to the detriment of the plaintiffs, as minority shareholders and directors."

The court then found that plaintiffs' valuation expert was more credible than defendants' expert and stated that "the validity and soundness" of Harfield's conclusions were proven by the "guest check" and "cost of foods sold" analyses, and that Raidt's conclusion was "not convincing or persuasive" because he failed to utilize the contents of the 1983 diary and relied solely upon the historical financial data of the Corporation and other information provided by Peter Georgou. The court therefore found that plaintiffs' shares were valued at $1.394 each and ordered that the Corporation purchase those shares for a total of $683,060. The court then stated that "[s]hould the corporation fail to purchase said shares within 30 days as herein directed the court will entertain appropriate motions for judgments against, or personal commitments from, the other shareholder defendants as may be appropriate."

Despite the court's order, the Corporation never purchased plaintiffs' shares and instead filed for bankruptcy protection in Federal court. Thereafter, plaintiffs filed as unsecured creditors of the Corporation. Plaintiffs also filed in the circuit court of Cook County a motion to enter judgment against the individual defendants and to compel Peter and Mary Ann Georgou to purchase their shares. On July 23, 1991, after extensive argument, Judge Barth found that Judge

Shields contemplated further action in the circuit court and therefore ruled that he could properly grant judgment against the individual defendants without conducting an entirely new trial. The court then ordered defendants to purchase plaintiffs' shares for a total of $683,060. This appeal followed.

## I

Defendants first contend that plaintiffs cannot bring their claim in an individual capacity, insisting that their only recourse is a shareholder's derivative suit because the cause of action belonged to the Corporation rather than the shareholders. They assert that plaintiffs will be unjustly enriched because their action is essentially one based upon the dimunition of corporate stock, a harm typically compensable only through a derivative action.

■ It is well settled that shareholders' derivative suits are appropriate where the plaintiffs allege that the directors or officers breached their duty to the corporation and the corporation has been injured as a result. (*Brown v. Tenney* (1988), 125 Ill. 2d 348, 355, 532 N.E.2d 230; *Shlensky v. South Parkway Building Corp.* (1960), 19 Ill. 2d 268, 166 N.E.2d 793.) By their very nature, shareholder derivative suits are brought to maintain the continued and profitable existence of the corporation; therefore, the corporation is considered a necessary party to the action because recovery runs to it rather than the individual shareholders. *Feen v. Ray* (1985), 109 Ill. 2d 339, 345, 487 N.E.2d 619.

■ In contrast to the rule that shareholders are normally limited to derivative actions is the rule that a minority shareholder may sue the corporation directly for its dissolution if he can establish that "those in control of the corporation have acted *** in a manner that is illegal, oppressive or fraudulent." (Ill. Rev. Stat. 1985, ch. 32, par. 12.50(b)(2) (now codified as 805 ILCS 5/12.50(b)(2) (West 1992)).) The rationale underlying this remedy is to protect the interests of minority shareholders against majority shareholders who "reap the benefits of ownership through compensation and other withdrawals not available to the minority." (Murdock, *The Evolution of Effective Remedies for Minority Shareholders and Its Impact Upon Valuation of Minority Shares*, 65 Notre Dame L. Rev. 425, 425 (1990).) Thus, direct actions for dissolution enable minority shareholders to recover their investment from the corporation when no other methods are available.

Dissolution has long been considered a drastic remedy, however, and alternative remedies have been devised to avoid its being forced

on an unwilling majority by an "obstreperous minority." (Murdock, 65 Notre Dame L. Rev. at 461.) Our legislature has provided several alternate remedies, including the purchase of the shares owned by the complaining shareholder by either the corporation or "any shareholder or group of shareholders." Ill. Rev. Stat. 1985, ch. 32, par. 12.55(g) (now codified as 805 ILCS 5/12.55(g) (West 1992)).

■■ In the instant case, plaintiffs sought to dissolve the Corporation due to the Georgou's "illegal and fraudulent conduct." Therefore, no problem exists in plaintiffs' choice to proceed in an individual rather than derivative manner. Moreover, because defendants themselves petitioned the court to authorize their purchase of plaintiffs' stock and to determine its "fair value," they are estopped from challenging the propriety of that order on appeal. See *Young v. Hummel* (1991), 216 Ill. App. 3d 303, 312, 576 N.E.2d 1072, *appeal denied* (1991), 141 Ill. 2d 563, 580 N.E.2d 138 ("a party who obtains by judgment all that has been requested cannot appeal from that judgment").

## II

Defendants next contend that the circuit court accepted an inappropriate method of determining the "fair value" of plaintiffs' shares because plaintiffs' expert relied upon improper factors. Defendants also maintain that the determination of a "fair value" of $683,060 was against the manifest weight of the evidence.

■■ Under section 12.55 of the Business Corporation Act, "the court shall determine the fair value of the shares as of such date the court finds equitable" utilizing the appraisal procedures outlined in section 11.70 of the Business Corporation Act. (Ill. Rev. Stat. 1985, ch. 32, par. 12.55(g) (now codified, as amended, as 805 ILCS 5/ 12.55(g) (West 1992)).) Section 11.70 provides that the jurisdiction of the court is "plenary and exclusive" and that it may appoint appraisers to receive evidence and recommend a decision on the question of "fair value." (Ill. Rev. Stat. 1985, ch. 32, par. 11.70(f) (now codified, as amended, as 805 ILCS 5/11.70(f) (West 1992)).) Although no statutory definition of fair value is provided, our courts have held that it should be "determined by an exercise of the court's judgment after consideration of all relevant factors." (*Taxy v. Worden* (1989), 181 Ill. App. 3d 97, 101, 536 N.E.2d 901.) "Relevant factors" include: the market price for the shares; the nature of the business and its history; the economic outlook of the business and the specific industry; and its book value and financial condition. (*Taxy*, 181 Ill. App. 3d at 101.) Furthermore, because there is no precise method for determining the market value of closely held stock (*In re Marriage of Mitchell* (1981),

103 Ill. App. 3d 242, 248, 430 N.E.2d 716), it is appropriate to consider the entire set of circumstances comprising the corporation's finances and business. (*Flynn v. Zimmerman* (1960), 23 Ill. App. 2d 467, 478, 163 N.E.2d 568.) Finally, if the record "reflects careful consideration of all the evidence presented," the court's finding will be affirmed on appeal unless it is contrary to the manifest weight of the evidence. *Taxy*, 181 Ill. App. 3d at 104.

■ In the instant case, defendants assert that the inclusion of the underreported sales and the lost interest in the determination of "fair value" was inappropriate. We disagree. The record demonstrates that in addition to examining the Corporation's book value and financial condition, Harfield utilized the underreported sales and lost interest to compare the Corporation's economic outlook to that of others in the restaurant industry. Because such factors are considered "relevant" under our law, we cannot conclude that their inclusion was inappropriate.

Furthermore, we do not believe that the court's determination that the fair value of plaintiff's shares was $683,060 was against the manifest weight of the evidence. Harfield's conclusion was verified by two separate statistical analyses, and nothing in the record rebuts their validity. Although defendants presented Raidt's testimony to contradict Harfield's conclusion, the circuit court specifically found that he was not credible. Because the determination of credibility is within the exclusive realm of the trier of fact (*Tsai v. Kaniok* (1989), 185 Ill. App. 3d 602, 606, 541 N.E.2d 819), we cannot conclude that the court's determination of fair value was against the manifest weight of the evidence.

## III

Defendants next contend that Judge Barth impermissibly altered Judge Shields' order by entering personal judgments against them without first conducting a new trial. Plaintiffs respond that rather than altering the earlier order, Judge Barth merely complied with the judgment decree which stated that the court would "entertain appropriate motions for judgments against, or personal commitments from, the other shareholder defendants."

■ Although a successor judge may not make factual determinations based solely on the reading of a transcript from a hearing conducted by another judge (see *In re Marriage of Sorenson* (1984), 127 Ill. App. 3d 967, 969, 469 N.E.2d 440 (noting that litigants are entitled to the resolution of factual questions by an arbiter who has had the opportunity to observe the demeanor of the witnesses and to as-

sess their credibility)), he may issue an order based upon his predecessor's findings of fact. (See *In re McMahon* (1991), 221 Ill. App. 3d 383, 389-90, 581 N.E.2d 1208 (holding that no error occurred where a successor judge signed a commitment order based on the oral findings of the predecessor judge).) In the instant case, no issues of fact needed to be relitigated before Judge Barth could enter the order against the individual defendants. Instead, Judge Barth found, and we agree, that the plain language of the prior order demonstrated an intent to hold defendants personally responsible if the Corporation failed to purchase the shares. Because no questions of fact were presented to Judge Barth, the demeanor of the witnesses was not relevant to his ruling. We therefore hold that Judge Barth properly entered a judgment order against the individual defendants without first conducting a new trial.

## IV

■ Defendants next contend that they were prejudiced when their attorney failed to withdraw and assume the witness stand to rebut Pappas' testimony that he directed his secretary to alter the corporate records. We note, however, that defendants' argument is essentially that they received "ineffective assistance of counsel." While the right to the effective assistance of counsel is firmly grounded in our criminal jurisprudence (see *Strickland v. Washington* (1984), 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052), no such right exists on the civil side. We therefore find defendants' assertions to be utterly devoid of merit.

## V

Defendants last contend that the doctrine of election of remedies precluded plaintiffs from seeking the relief obtained here because they previously filed a claim against the debtor-corporation in Federal bankruptcy court. They assert that after attempting to enforce their judgment against the Corporation in the bankruptcy proceedings, it was legally inconsistent for plaintiffs to seek relief from the individual defendants. Plaintiffs respond that the doctrine of election of remedies does not apply to this case because the remedies are consistent and complementary. They maintain that since they can have only one satisfaction of their claim, remedies against both the Corporation and the individuals are appropriate to remedy the fraud committed by defendants. We agree.

Under Illinois law, the doctrine of election of remedies will preclude a subsequent proceeding if the remedies sought are so inconsis-

tent and irreconcilable that a party could not logically follow one without renouncing the other. (*Fleming v. Dillon* (1938), 370 Ill. 325, 332, 18 N.E.2d 910; *Paoli v. Zipout, Inc.* (1959), 21 Ill. App. 2d 53, 57, 157 N.E.2d 79.) Defendants rely upon cases which hold that the doctrine of election of remedies applies to the filing of a claim in bankruptcy court. (*In re Witte* (7th Cir. 1988), 841 F.2d 804, 808 (holding that by seeking forfeiture of an installment land sales contract, the seller was barred from seeking damages in bankruptcy court because it would lead to "double recovery"); *In re Jacob Berry & Co.* (2d Cir. 1909), 174 F. 409 (holding that a creditor may not sue a bankrupt entity for breach of contract based on wrongful conversion of stock and then also seek to reserve rights in those same stock certificates).) We consider those cases to be easily distinguishable from the case at bar.

In both of those cases, the party sought two remedies which were inherently inconsistent and could not be reconciled. In *Witte*, the creditor attempted to recover damages under the contract while at the same time disaffirming its continued existence by seeking forfeiture. Similarly, the creditor in *Jacob Berry* sought to assert his rights in the stock while at the same time seeking damages for wrongful conversion. Had he sought the imposition of a constructive trust rather than damages, the remedies would have been consistent, but by essentially disaffirming any interest in the stock and yet attempting to recover their equivalent value, his actions could not be reconciled.

■ In contrast, there is no difficulty in reconciling plaintiffs' actions here. First, plaintiffs have never taken any action disavowing their remedy against the Corporation. Rather, the record demonstrates that they have persistently sought relief from the Corporation and obtained a judgment against the individuals only when the Corporation failed to comply with the original court order. Thus, the doctrine of election of remedies does not bar recovery in this case.

## VI

■ In their cross-appeal, plaintiffs contend that the circuit court abused its discretion when it denied their requests for prejudgment interest and punitive damages. We note, however, that interest is to be awarded in connection with the purchase of stock pursuant to section 12.55 only from the date of judgment, and not from the valuation date as plaintiffs seek here. See *Taxy*, 181 Ill. App. 3d at 106.

Furthermore, punitive damages will not be awarded as a matter of right. (*Winters v. Greeley* (1989), 189 Ill. App. 3d 590, 596, 545 N.E.2d 422.) Rather, the decision to award them is within the sound

discretion of the circuit court and that decision will not be reversed on appeal absent an abuse of discretion. (*Warren v. LeMay* (1986), 142 Ill. App. 3d 550, 491 N.E.2d 464.) In the instant case, no such abuse of discretion occurred. Instead, the record discloses that Judge Shields carefully considered all the evidence and arguments and determined that punitive damages were inappropriate. Accordingly, we reject the contentions raised in plaintiffs' cross-appeal.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

McCORMICK, P.J., and SCARIANO, J., concur.