WEIGEL BROADCASTING COMPANY, Plaintiff-Appellee and Cross-Appellant, v. LLOYD C. SMITH *et al.*, Defendants (Lloyd C. Smith *et al.*, Defendants-Appellants and Cross-Appellees).

First District (4th Division)   No. 1—95—1626

Opinion filed December 12, 1996.—Rehearing denied July 17, 1997.—Modified opinion filed July 24, 1997.

Robert J. Bates, Jr., and Mark G. Sheridan, both of Bates, Meckler, Bulger & Tilson, and G. Gale Roberson, Jr., of McBridge, Baker & Coles, and William G. Sullivan, of Martin, Brown & Sullivan, all of Chicago, for appellants.

Bruce S. Sperling and Mitchell H. Macknin, both of Sperling, Slater & Spitz, P.C., of Chicago, for appellee.

JUSTICE WOLFSON delivered the opinion of the court:

The minority shareholders in this case had no choice: they had to sell their shares to the majority. This dispute concerns the value of the minority shares. To resolve the issue, we have to determine the meaning of the words "fair value" in the Business Corporation Act of 1983 (805 ILCS 5/11.70 (West 1992)).

On January 5, 1988, Weigel Broadcasting Co. (Weigel) petitioned the court to determine the "fair value" of its common stock, in accord with section 11.70 of the Business Corporation Act (805 ILCS 5/11.70 (West 1992)), after a number of minority shareholders dis-

sented from the company's plan to buy them out in a reverse stock split. The trial court valued the stock at $126 per share and awarded 7% prejudgment interest. Some of the dissenting minority shareholders have appealed, arguing that the trial court valued the stock too low. They also ask for prejudgment interest at the rate of 9.59%.

Weigel cross-appeals the prejudgment interest awarded, arguing for a 5% statutory rate.

We affirm the trial court's valuation of the shares and determination of the applicable interest rate, although we modify the trial court's view of how long interest should run.

BACKGROUND

In 1987, Weigel was a company engaged in the business of commercial television broadcasting. Incorporated in Illinois with its principal business office in Chicago, Weigel operated two television stations, WCIU-TV Channel 26 in Chicago and W55AS Channel 55 in Milwaukee, Wisconsin.

On November 16, 1987, Weigel's board of directors sent its shareholders a notice informing them that the board was proposing a "reverse stock split." According to the proposal, 1,750 shares of "old" Weigel stock would be redeemable for one share of "new" Weigel stock. Anyone holding less than 1,750 shares would turn in his or her shares for cash. No fractional shares would be allowed.

At the time of the proposed reverse stock split, Weigel had 88,167 outstanding shares of "old" common stock. Howard Shapiro, then-president of Weigel, and certain members of his family were the beneficial owners of approximately 83% of these outstanding shares. The remaining 17% of the "old" shares were owned by 143 shareholders.

In an information statement sent to the minority shareholders, it was explained that the reverse stock split would have the effect of eliminating all of the minority shareholders and would make Shapiro and his family members the owners of all of the outstanding "new" shares of the company. The purpose for the proposed action was twofold: to reduce the number of shareholders so that the corporation could qualify for subchapter S status and to eliminate the administrative expense and delay associated with notifying minority shareholders of all corporate actions when the minority shareholders, even collectively, were unable to control or direct the corporation's business affairs.

Due to the conflict of interest between the controlling shareholders and the minority shareholders, the board of directors hired an independent valuation consulting firm, Valtec, to determine the fair value of Weigel stock. Based on Valtec's valuation, Weigel offered $115 per "old" share of stock as the cash buy-out price.

Weigel's board of directors resolved, as provided for in section 11.65(a)(4) of the Business Corporation Act of 1983 (Act) (805 ILCS 5/11.65(a)(4) (West 1992)), that its shareholders could dissent and obtain payment for their shares in accord with section 11.70 of the Act. In an information statement dated November 23, 1987, the minority shareholders were informed of their right to dissent from the estimated fair value that Weigel had determined.

The board of directors reserved the right not to proceed with the reverse stock split if enough minority shareholders declined to accept the per-share offer. After receiving the notice and information statement, 125 of the 143 minority shareholders opted to accept the $115-per-share cash buy-out price. Because a high number of shareholders accepted the per-share offer, Weigel effected the reverse stock split on December 31, 1987.

On January 5, 1988, Weigel filed a petition in the circuit court of Cook County, pursuant to section 11.70(f) of the Act, asking the court to determine and declare the fair value of Weigel's common shares of stock for the remaining minority shareholders who chose to exercise their dissenters' rights.

At a hearing on the petition, Weigel presented the testimony of its expert, John McCluskey, who valued the stock using a discounted cash flow method and a market approach. In McCluskey's opinion, all factors bearing on the value of the stock, including illiquidity (the fact that there was no open market for the shares) and minority (the fact that the blocks of shares held by the dissenters were small and did not represent controlling interest over the company), had to be considered when determining fair value. Since there was no plan to liquidate the corporation, and since there had never been any payment of dividends on the common shares and there was no expectation that dividends would be paid in the future, McCluskey opined that Weigel's per-share offer of $115 was a fair value for the stock held by the minority dissenters. This figure represented the net asset value of the shares, to which a 50% discount had been applied due to the illiquidity and minority of the shares.

The dissenting minority shareholders also presented an expert, Thomas Buono. Buono, using three different models, determined the value of the Weigel corporation. He then contended that the fair value of the shares was a simple *pro rata* division of the corporate assets, without any discounts. Buono valued the shares at $578.41. Discounts for minority and illiquidity of the shares, he said, were inappropriate.

After hearing all of the evidence, the court specifically stated that it considered a number of factors in evaluating the Weigel stock,

including the nature and history of the business, its general economic outlook and the economic outlook for the specific industry, the book value of the stock, the business's financial condition and earning capacity and dividend paying history, as well as recent sales of stock. The court went on to state that "the testimony of Mr. McCluskey has a more credible and relevant impact on these factors as compared to the testimony of Mr. Buono." The court then found the fair value of the stock to be $126 per share and awarded 7% prejudgment interest.

DECISION

The Stock Valuation

The primary issue before this court is whether the trial court's award of $126 per share and 7% interest provided the dissenting stockholders with a "fair value" for their stock.

The main thrust of the dissenting shareholders' position is that "fair value" does not equal "fair market value." Fair value, the dissenters say, is "a proportional share of the corporation as a going concern" or "a pro rata share" of the corporation and all its assets without any discount for illiquidity or minority. Market value, however, as the name implies, involves the marketability of the shares or the value that the shares would command on an open market in an arm's-length transaction between a willing buyer and a willing seller. Marketability, but not fair value, they say, takes into consideration such factors as illiquidity and minority.

Because the trial court discounted the value of their shares due to their illiquidity and minority, the dissenters say, the trial court equated fair value with market value. In this way the trial court erred as a matter of law and this court should review the valuation *de novo.*

Weigel disagrees and asks this court to uphold the trial court's fair value determination because it is not against the manifest weight of the evidence. We agree that the proper test is whether the trial court's conclusions were against the manifest weight of the evidence. *Stanton v. Republic Bank*, 144 Ill. 2d 472, 479, 581 N.E.2d 678 (1991).

The first matter to resolve is how to determine "fair value" within the context of the Business Corporation Act.

■ Section 11.70(f) of the Act provides, in pertinent part:

"If, within 60 days from delivery to the corporation of the shareholder notification of estimate of fair value of the shares and interest due, the corporation and the dissenting shareholder have not agreed in writing upon the fair value of the shares and inter-

est due, the corporation shall either pay the difference in value demanded by the shareholder, with interest, or file a petition in the circuit court of the county in which either the registered office or the principal office of the corporation is located, requesting the court to determine the fair value of the shares and interest due." 805 ILCS 5/11.70(f) (West 1992).

There is no statutory definition of "fair value." Section 11.70(j) of the Act states only that fair value "means the value of the shares immediately before the consummation of the corporate action to which the dissenter objects excluding any appreciation or depreciation in anticipation of the corporate action, unless exclusion would be inequitable." 805 ILCS 5/11.70(j) (West 1992).

■ Courts have held that there is no "precise method" for valuing the stock of a closely held corporation, but that all "relevant factors" may be considered. *Kalabogias v. Georgou*, 254 Ill. App. 3d 740, 748, 627 N.E.2d 51 (1993). A relevant factor can be anything that might impact on the stock's intrinsic value. *Independence Tube Corp. v. Levine*, 179 Ill. App. 3d 911, 917, 535 N.E.2d 927 (1988). A list of factors that may be relevant to the determination of fair value of stock includes: earning capacity, investment value, history and nature of the business, economic outlook, book value, dividend paying capacity, and market price of stock of similar businesses. *Stanton v. Republic Bank*, 144 Ill. 2d 472, 479, 581 N.E.2d 678 (1991). It is for the trial court to decide what weight to give the various factors. Its decision, made after careful consideration of all the evidence presented, should not be overturned unless it is against the manifest weight of the evidence. *Kalabogias v. Georgou*, 254 Ill. App. 3d at 749; *Institutional Equipment & Interiors, Inc. v. Hughes*, 204 Ill. App. 3d 922, 931, 562 N.E.2d 662 (1990).

The fact that the statute requires dissenting shareholders to be given "fair value," without specifically defining the term, we think, evidences a legislative intent to allow courts the freedom to fashion a remedy without limiting them to any single form of valuation. It is a legislative grant of broad discretion.

If "fair value" meant only "fair market value" and there was no market for the stock, would the stock have no value? Clearly, this would not be the case. Therefore, courts must have the ability to consider many factors when determining the value to be placed on stock.

The statutory directive, therefore, is in complete accord with the case law which provides that no single methodology of determining "fair value" should be operative. Determining "fair value" is not "an exact science, but involves many subjective and complex determina-

tions." *Stewart v. D.J. Stewart & Co.*, 37 Ill. App. 3d 848, 855, 346 N.E.2d 475 (1976).

Having determined that there is no precise method for determining "fair value," we now consider whether the trial court erred in its determination of "fair value" in this case.

■ The court stated in *Laserage Technology Corp. v. Laserage Laboratories, Inc.*, 972 F.2d 799, 805 (7th Cir. 1992), "Illinois courts have made clear that the two terms ['fair value' and 'fair market value'] are *not necessarily* synonymous." (Emphasis added.) But none of the cases suggests that fair value can never be equated to fair market value. The market value of stock is one of the factors that may be considered by the court when making its valuation. In fact, in *Independence Tube Corp. v. Levine*, 179 Ill. App. 3d 911, 917, 535 N.E.2d 927 (1988), the court noted that market value is one of three recommended methods of determining fair value.

■ A review of the record in the present case does not indicate that the trial court improperly construed the term "fair value." The trial court specifically stated in its judgment that it considered several factors when valuing the Weigel stock. It enumerated certain factors it considered, including the nature and history of the business, the economic outlook of the industry and, in general, the book value of the stock, the company's financial condition and earning capacity, as well as its dividend paying capacity, good will, previous sales of stock, and market price of stocks of similar corporations. If the court in determining "fair value" gave greater weight to the stock's market value, it does not mean that other factors were not taken into account. See *Institutional Equipment & Interiors, Inc. v. Hughes*, 204 Ill. App. 3d 922, 562 N.E.2d 662 (1990).

There is a question, however, whether the trial court erred in discounting the fair value of the shares based on illiquidity and minority. In *Independence Tube*, the court noted that the propriety of using discounts when determining "fair value" in the context of the Act had not, until that time, been addressed by any court. After a review of authorities in other jurisdictions, the court decided that "it may be appropriate for the trial court to consider a minority interest factor or a lack of marketability factor." *Independence Tube*, 179 Ill. App. 3d at 917.

Applying such discounts, therefore, is left to the trial court's discretion. See also *Stanton v. Republic Bank*, 144 Ill. 2d 472, 479, 581 N.E.2d 678 (1991) (trial court acted within its discretion when it applied minority and illiquidity discounts). The question is whether the trial court abused its discretion by applying these discounts under the facts of this case.

The dissenters point out that in both cases where discounts were applied, *Independence Tube* and *Stanton*, the dissenting stockholders were under no compulsion to relinquish their shares. In this case, the dissenters had no choice.

In *Independence Tube*, in an effort to reduce the number of shareholders so that subchapter S status could be achieved, the company proposed an amendment to its articles of incorporation that would make class A and class B shares equal in economic respects. At the same time the company offered to purchase all class A shares for $500 and class B shares for $25. Levine, as trustee for 500 class A shares of stock, dissented from the proposed amendment and demanded payment for the value of these shares. Later, the proposed amendment was passed and Independence purchased 8,925 class A shares and 31,400 class B shares. Levine notified Independence that he believed the shares were worth $774.51 per share and demanded the additional value. A petition then was filed for the court's valuation of the shares.

In *Stanton*, the directors of the Republic Bank of South Chicago planned to reorganize, making the bank a wholly owned subsidiary of a newly formed Delaware chartered bank. Each share of Republic stock would be traded for 10 shares of the new bank's stock. Certain shareholders dissented from the proposed merger, not wanting to become shareholders in the new bank. When the merger was later approved, the dissenting shareholders refused the bank's offer to buy their shares and, instead, perfected their rights under the Illinois Banking Act (Ill. Rev. Stat. 1989, ch. 17, par. 336).

The question is whether these situations significantly differ from the facts of the present case, making them distinguishable with regard to the application of discounts for lack of marketability and minority.

We find nothing in the Business Corporation Act or the reported decisions that would make the holdings in *Independence Tube* and *Stanton* inapplicable to this case. We see no principled reason to say *Independence Tube* and *Stanton* apply only where the dissenting shareholders could refuse to sell their shares.

Next this court must consider whether the trial court's fair value determination was against the manifest weight of the evidence. We think it was not. The $578-per-share figure reached by the dissenters' expert was based on projected models of the corporation that the trial court found not credible.

The trial court did state, incorrectly, that no sale of Weigel stock had ever realized more than $115. This was clearly not the case. Weigel's exhibit 18, stipulated to by all of the parties, demonstrates that

there were a number of stock transactions in June and November of 1987 in which Weigel stock traded for amounts in excess of $115. Still, the average price that Weigel stock was bought and sold for during the period of 1980 through 1987 was about $47. The trial judge gave weight to that average sale price.

The trial court's determination that $126 per share was a fair value for the dissenters' stock was not error. This figure was close to the value set by Weigel's expert, whom the court found to be more credible. The record indicates that the figure was reached after a close examination of all of the evidence presented.

The cases cited by the dissenters in which the trial courts chose not to apply minority and illiquidity discounts are factually distinguishable. In *Institutional Equipment & Interiors, Inc. v. Hughes*, 204 Ill. App. 3d 922, 930-31, 562 N.E.2d 662 (1990), the court heard evidence from one party's expert that the stock value should be discounted 20% for illiquidity. Evidence from the opposing expert suggested that a 30% premium should be added because the stock purchase would turn over control of the company. The court rejected both suggestions and adopted instead the adjusted book value as the fair value of the stock. The decision to reject the illiquidity discount, however, was not based on a finding that such discounts were inapplicable.

In *Hickory Creek Nursery, Inc. v. Johnston*, 167 Ill. App. 3d 449, 521 N.E.2d 236 (1988), the court was asked to value Johnston's one-third interest in Hickory Creek Nursery, which the court had ordered Johnston to transfer to the corporation as partial satisfaction of a judgment against him. Under these circumstances the court ruled that a minority discount was inapplicable since the minority interest was being "assumed by the remaining shareholders resulting in a substantial *pro rata* increase in their share and control of the corporation." 167 Ill. App. 3d at 455.

The same situation does not exist in the present case. Shapiro always had controlling interest in the Weigel company. The shares of the dissenting shareholders did not materially increase Shapiro's control over, or position within, the company. The trial court, we think, was justified in finding the illiquidity and minority factors had a significant bearing on the intrinsic value of the stock, especially in the absence of any claim of oppressive corporate conduct. For a contrary view, see C. Murdock, *The Evolution of Effective Remedies for Minority Shareholders and its Impact Upon Valuation of Minority Shares*, 65 Notre Dame L. Rev. 425 (1990).

The Interest Award

The Act provides that a dissenter is entitled to interest if the fair value of his shares, as determined by the court, exceeds the amount paid by the corporation. In 1987, at the time of corporate action giving rise to this case, the Act provided that interest should be awarded "at such rate as the court may find to be fair and equitable in all the circumstances." Ill. Rev. Stat. 1987, ch. 32, par. 11.70(g).

■ In 1990 the statute was amended and section (j) was added. Section 11.70(j)(2) of the Act states:

" 'Interest' means interest from the effective date of the corporate action until the date of payment, at the average rate currently paid by the corporation on its principal bank loans or, if none, at a rate that is fair and equitable under all the circumstances." 805 ILCS 5/11.70(j)(2) (West 1992).

In this case, since the trial court's fair value determination of $126 per share exceeded the $115 offered by the corporation, the dissenters were entitled to interest. The trial court awarded 7% simple interest. Both sides argue that this interest award was error.

The dissenters, relying on the amended statute, point to the fact that Weigel borrowed $300,000 in December 1987 at the prime rate of 9.59%. They contend, therefore, that the trial court was constrained to award interest at the rate of 9.59%. Additionally, they say, Weigel wrongly withheld the fair value of their shares and, thereby, retained the beneficial use of their monies, allowing them to earn interest on their interest. For this reason, the dissenters urge this court to find that an award of 9.59% interest, compounded quarterly, is necessary to make them whole. The dissenters cite one Maine case in which compound interest was awarded.

Weigel argues, first of all, that the 1990 amendment to the statute is inapplicable, so that the trial court was required only to award a rate that was "fair and equitable." A fair and equitable rate, Weigel urges, is the 5% statutory interest rate.

We find neither argument persuasive.

■ In *Stanton v. Republic Bank*, 144 Ill. 2d 472, 581 N.E.2d 678 (1991), the court flatly rejected the proposal that the Illinois interest rate statute should be applied in situations where dissenters seek a "fair value" determination for their shares. In *Stanton* the court was asked to assess the "fair value" of stock within the context of the Illinois Banking Act. The court noted that the interest statute applied in "five specific situations, none of which exist in the instant case." 144 Ill. 2d at 480-81.

The Illinois interest statute is inapplicable here. Furthermore, Weigel can point to no Illinois valuation case in which the statutory rate of interest was applied.

By the same token, the prime rate of 9.59% need not have been adopted by the trial court as the proper rate. First, 9.59% was not an "average rate" of interest paid by the corporation. Second, as Weigel points out, the relevant date in this matter is December 30, 1987.

The proper statute for determining the applicable interest rate should be the statute in effect at that time. Thus, the trial court was to award an interest rate that was "fair and equitable" under the circumstances. With that as the standard, as the court stated in *Stanton*, it was within the trial court's discretion to award any reasonable rate of interest between the 5% statutory rate and the current prime rate requested by the dissenters. The parties have given no persuasive arguments that would induce this court to depart from the trial court's ruling that 7% simple interest was appropriate under the circumstances.

Compound interest is not authorized by the Act, nor is the award of compound interest favored in Illinois law. *Tadros v. Kuzmak*, 277 Ill. App. 3d 301, 660 N.E.2d 162 (1995). In general, compound interest is available only when there is no statutory bar and the parties specifically agree to compound interest. *Helland v. Helland*, 214 Ill. App. 3d 275, 573 N.E.2d 357 (1991).

Furthermore, the court's fair value determination of $126 per share was much closer to the $115 per share offered by Weigel than it was to the $578-per-share fair value asserted by the dissenters. There is no reason to believe that Weigel was guilty of any wrongdoing that might warrant an equitable award of compound interest. See *Ryan v. City of Chicago*, 274 Ill. App. 3d 913, 654 N.E.2d 483 (1995).

Lastly, we agree with the dissenters that the Act provides for the accrual of interest "to the date of payment." 805 ILCS 5/11.70(j) (West 1992). This specific statutory provision should supersede the general statutory provision of section 2—1303 of the Code of Civil Procedure (735 ILCS 5/2—1303 (West 1992)), which provides that interest ceases to accrue once payment is tendered. Interest should be computed from December 30, 1987, until the date that payment actually is made. We remand this cause to the trial court for a hearing to determine whether interest should be based on the $126 we have found to be the fair value of each share or on the difference between the $115 tender by the corporation and $126.

## CONCLUSION

We affirm the trial court's fair value determination and the award of 7% simple interest. We modify the trial court's judgment to provide that interest shall run until the date payment is made. We

remand this cause to the trial court for a calculation of interest consistent with this opinion.

Affirmed as modified and remanded.

CAMPBELL and BUCKLEY, JJ., concur.