**PUEBLO BANCORPORATION,**
a Colorado corporation,
Plaintiff–Appellee,

v.

**LINDOE, INC., a Colorado corporation,**
Defendant–Appellant.

No. 00CA1777.

Colorado Court of Appeals,
Div. I.

Aug. 16, 2001.

As Modified on Denial of Rehearing
Sept. 20, 2001.

Certiorari Granted Jan. 14, 2002.

Rothgerber Johnson & Lyons LLP, Gregory B. Kanan, Cindy C. Oliver, Denver, CO; Altman, Keilbach, Lytle, Parlapiano & Ware, P.C., Wm. David Lytle, Pueblo, CO, for Plaintiff–Appellee.

Fairfield and Woods, P.C., Peter F. Breitenstein, Denver, CO; Gradisar, Trechter, Ripperger, Roth & Croshal, Nicholas A. Gradisar, Pueblo, CO, for Defendant–Appellant.

Opinion by Judge ROY.

In this corporate dissenter's rights action, defendant, Lindoe, Inc. (shareholder), appeals the trial court's valuation of its shares of stock in plaintiff, Pueblo Bancorporation (holding company). We affirm in part, reverse in part, and remand for entry of judgment.

Holding company is a closely held Colorado corporation headquartered in Pueblo, Colorado, the principal asset of which is Pueblo Bank and Trust Company (the Bank). Shareholder, which is itself a bank holding company, held 6,525 of the 114,217 outstanding shares of holding company. Shareholder first purchased shares in holding company at the request of a member of its board of directors when the Bank was in distress and needed additional capital. Shareholder subsequently purchased additional shares when they became available.

Holding company was originally a Subchapter C corporation (C Corp) under 26 U.S.C. §§ 301–385 (2001). In order to take advantage of a more favorable tax treatment, holding company formed a new corporation, merged with it, and as the surviving corporation thereafter elected to become Subchapter S Corporation (S Corp) under 26 U.S.C. §§ 1361–1379 (2001).

An S Corp may not have a C Corp as a shareholder. Shareholder, a C Corp, therefore, could not remain a shareholder in the merged holding company. Holding company informed shareholder that it would either have to convert to an S Corp itself or distribute its shares to its individual shareholders in order to remain qualified to own stock in holding company following the merger. Neither of these alternatives was acceptable to

shareholder, so it was forced to sell its shares in holding company.

On October 6, 1997, the holding company's directors approved the Merger Agreement and Plan of Merger and the merger's "Cash Consideration" of $341 per share. On October 25, 1997, the merger was approved by the holding company's shareholders, with only shareholder dissenting. On November 26, 1997, holding company sent a notice to shareholder informing it that the merger had been approved and it could receive payment for its shares by sending a demand for payment, which shareholder did on December 3, 1997. On December 8, 1997, shareholder received notice that the "fair value" of its shares was $341 per share and received payment of $341 per share plus interest at 8% from November 18, 1997.

However, shareholder estimated that the "fair value" of its shares was $775 per share and demanded payment in that amount with interest after credit for the amount previously tendered. Following shareholder's demand, holding company initiated the present action pursuant to Colorado's dissenters' rights statute, § 7–113–301, C.R.S.2000, to obtain a judicial appraisal of the "fair value" of its shares.

The trial court concluded that the pro rata value of the outstanding shares in holding company was $666.16 per share. The trial court then applied a minority discount and a marketability discount, each 30%, and found the "fair value" of the shares to be $362.03 per share. On February 28, 2000, the trial court entered a judgment in favor of shareholder for $137,220.75 plus interest. The trial court then ordered each party to pay their respective expenses and fees, but ordered holding company to pay costs pursuant to § 17–113–302, C.R.S.2000.

On August 18, 2000, the trial court ordered holding company to pay costs in the amount of $7,626.44 and interest at the legal rate of 8%.

I.

Shareholder first argues that the trial court erred in determining the enterprise value of holding company as a going concern. We disagree.

The trial court's task in an appraisal action is to determine the "fair value" of plaintiff's shares. "Fair value," for this purpose, is defined as:

the value of the shares immediately before the effective date of the corporate action to which the dissenter objects, excluding any appreciation or depreciation in anticipation of the corporate action except to the extent that exclusion would be inequitable.

Section 7–113–101(4), C.R.S.2000.

■ "The term 'fair value' used in the dissenters' rights statute connotes a broader approach to valuation than does the term 'fair market value.'" *M Life Insurance Co. v. Sapers & Wallack Insurance Agency, Inc.,* 40 P.3d 6 (Colo.App.2001) (*M Life*). A court's determination of fair value depends on the particular circumstances of the corporation involved. *Walter S. Cheesman Realty Co. v. Moore,* 770 P.2d 1308 (Colo.App.1988). When the court determines fair value, it must consider all the relevant value factors, most importantly market value, investment or earnings value, and net asset value. *WCM Industries v. Trustees of Wilson Trust,* 948 P.2d 36 (Colo.App.1997).

■ Because the determination of fair value is not susceptible to any one precise mathematical analysis, how the court weighs each value factor depends on the facts and circumstances of the particular case. *Pioneer Bancorporation, Inc. v. Waters,* 765 P.2d 597 (Colo.App.1988). A fair value determination is a factual one, and therefore, the trial court's valuation will not be disturbed unless clearly erroneous. *M Life, supra.*

■ Here, the trial court received three expert opinions, each valuing the stock differently. Each appraiser used acceptable techniques to value the holding company, but gave differing weights to the value factors. Thus, for example, while holding company's appraiser weighed net asset value at 20% of total value, shareholder's appraisers placed no weight on that value. Holding company's appraiser found the enterprise value of the corporation to be $70,700,000. Shareholder's

first appraiser found the enterprise value to be $82,768,000, and shareholder's second appraiser found the enterprise value to be between $82.8 million and $88.5 million. The trial court determined the proper enterprise value of the corporation to be $76,087,723, or $666.16 per share.

Although the trial court found holding company's appraiser the most reliable, it did not rely solely on that appraisal in determining the enterprise value. It appears that the trial court considered all three appraisals and other factors, such as other stock sales and the book value of the shares.

■■■ Because fair value is not determined by a precise mathematical formula, "the weighing of the factors is qualitative as well as quantitative." *M Life, supra*, 40 P.3d at 14. Moreover, a trial court, as fact finder, can accept or reject all or part of any witness' testimony. *Gordon v. Benson*, 925 P.2d 775 (Colo.1996). Therefore, there being adequate support in the record for the trial court's determination of the enterprise value of the holding company as a going concern, we will not disturb the trial court's valuation.

## II.

Shareholder's principal argument is that the trial court erred by applying the 30% minority and marketability discounts to the pro rata value of the shares to determine "fair value." We agree.

■■■ First, it is useful to understand the difference between a minority discount and a marketability discount. A minority discount adjusts for lack of control over the business entity on the theory that noncontrolling shares of stock are not worth their pro rata share of the corporation, because they lack voting power to control corporate actions. In contrast, a marketability discount adjusts for the illiquidity of the stock in a closely held corporation. *M Life, supra.*

Prior to the enactment of appraisal statutes, the only relief a minority shareholder could seek when the actions of the corporation were oppressive was the dissolution of a corporation. Upon dissolution, the net assets of the corporation are distributed to the shareholders "according to their interests."

*See, e.g.*, § 7–114–105(1)(d), C.R.S.2000. Dissolution of a corporation, particularly a going concern, is viewed as a drastic remedy and was rarely imposed. Therefore, a substantial number of states enacted statutes that provided alternative remedies for the minority shareholder, the most common being a judicially supervised buyout of the minority interests. Dissenting shareholder statutes are designed to provide a limited remedy that puts the dissenting minority shareholders in the position they would have been in had the corporation been dissolved. Simply put, these limited statutory rights act as a check against rampant majority rule and operate to protect minority shareholders by cashing them out. *See* Barry M. Wertheimer, *The Shareholders' Appraisal Remedy and How Courts Determine Fair Value*, 47 Duke L.J. 613 (1998)(stating that courts determining fair value should be aware of the purpose meant to be served by the remedy and therefore should not permit minority or marketability discounts); *see also*, Charles W. Murdock, *The Evolution of Effective Remedies for Minority Shareholders and Its Impact Upon Valuation of Minority Shares*, 65 Notre Dame L. Rev. 425 (1990)(Professor Murdock was a witness in the trial court.).

## A.

With respect to the minority discount, a division of this court held in *M Life, supra,* that in appraising a going concern, the minority discount should not, as a matter of law, be applied. The division concluded that the application of a minority discount (1) deprives minority shareholders of their proportionate interest in a going concern; (2) values minority shares below majority shares, resulting in unequal treatment of the same class of shares; (3) undermines the primary goal of the dissenters' rights statute, i.e., preventing minority shareholders from being forced to sell at unfairly low values while allowing the majority to proceed as it desires; and (4) encourages oppressive conduct by the majority. *See Friedman v. Beway Realty Corp.*, 87 N.Y.2d 161, 638 N.Y.S.2d 399, 661 N.E.2d 972 (1995).

"The term 'going concern' refers to an 'existing solvent business, which is being conducted in the usual and ordinary way for which it was organized.'" *M Life, supra* (quoting *Black's Law Dictionary* 691 (6th ed. 1990)). Here, the holding company is a going concern. The Bank was profitable, financially stable, and growing at the time of the merger; neither dissolution nor liquidation of the holding company was under consideration. Accordingly, we conclude that the trial court erred in applying the minority discount. *See M Life, supra.*

### B.

We next turn our attention to the marketability discount. In *M Life, supra,* the division held that a marketability discount could be applied in appropriate circumstances. The *M Life* division relied on *WCM Industries v. Trustees of Wilson Trust, supra,* in which another division of this court stated that a marketability discount was appropriate under some circumstances. In determining whether a marketability discount should be used, the *WCM* division stated, and the *M Life* division concurred, that the court should consider:

> whether the corporation is closely held, its tax status, whether there is any established or other market for the corporation's shares, the liquidity of the corporation and its shares, the nature and history of the business, the general economic outlook of the company and its specific industry, the book value of the stock, the financial condition of the business, its earning capacity, its dividend paying capacity, the value of good will and other intangibles, sales of stock, the market price of stock of corporations engaged in like businesses, Internal Revenue Service guidelines, and whether the stock is subject to restrictive agreements concerning its sale. We emphasize, however, that the appraiser and the trial court may consider any relevant factor relative to the worth and value of the corporation and its stock that is reasonable under the circumstances and is justified by the evidence presented.

*WCM Industries v. Trustees of Wilson Trust, supra,* 948 P.2d at 40. While this criteria set forth in *WCM* should certainly be applied in appraising a corporation as a going concern, it provides little guidance as to when a marketability discount should, or should not, be applied.

Several jurisdictions expressly allow a marketability discount in an appraisal action or hold that it is a question of fact for the trial court to determine. *See Offenbecher v. Baron Services, Inc.,* —— So.2d —— (Ala. Civ.App. No. 2000025, May 18, 2001); *Munshower v. Kolbenheyer,* 732 So.2d 385 (Fla. Dist.Ct.App.1999); *Weigel Broadcasting Co. v. Smith,* 289 Ill.App.3d 602, 225 Ill.Dec. 1, 682 N.E.2d 745 (1996), *modified on other grounds,* 289 Ill.App.3d 602, 225 Ill.Dec. 1, 682 N.E.2d 745 (1997); *Ford v. Courier–Journal Job Printing Co.,* 639 S.W.2d 553 (Ky.Ct.App.1982); *King v. F.T.J., Inc.,* 765 S.W.2d 301 (Mo.Ct.App.1988); *Friedman v. Beway Realty Corp., supra; English v. Artromick International, Inc.,* 2000 WL 1125637 (Ohio Ct.App. No. 99AP 578, Aug. 10, 2000)(statute requires a determination of "fair cash value," not "fair value"); *Columbia Management Co. v. Wyss,* 94 Or.App. 195, 765 P.2d 207 (1988). These courts reason that discounting the shares for lack of liquidity is appropriate because the discount does not discriminate against the minority shareholders as, at least in theory, it is equally applicable to majority shares. Therefore, so goes the reasoning, application of a marketability discount does not create a windfall for the majority shareholders. *See Offenbecher v. Baron Services, Inc., supra.*

There are, however, several jurisdictions that hold that no form of discount is applicable in a dissenting shareholder's appraisal action. *Cavalier Oil Corp. v. Harnett,* 564 A.2d 1137 (Del.1989); *Blitch v. Peoples Bank,* 246 Ga.App. 453, 540 S.E.2d 667 (2000); *Sieg Co. v. Kelly,* 568 N.W.2d 794 (Iowa 1997); *Arnaud v. Stockgrowers State Bank,* 268 Kan. 163, 992 P.2d 216 (1999); *In re Valuation of Common Stock of McLoon Oil Co.,* 565 A.2d 997 (Me.1989); *Rigel Corp. v. Cutchall,* 245 Neb. 118, 511 N.W.2d 519 (1994); *Lawson Mardon Wheaton, Inc. v. Smith,* 160 N.J. 383, 734 A.2d 738 (1999); *Charland v. Country View Golf Club,* 588

A.2d 609 (R.I.1991); *First Western Bank Wall v. Olsen*, 621 N.W.2d 611 (S.D.2001).

The leading case that propounds this view is *Cavalier Oil Corp. v. Harnett, supra*, in which the Delaware Supreme Court held that the question the court must ask in an appraisal action is "what has been taken from the shareholder: 'viz. his proportionate interest in a going concern.'" *Cavalier, supra*, 564 A.2d at 1144 (quoting *Tri–Continental Corp. v. Battye*, 31 Del.Ch. 523, 74 A.2d 71, 72 (1950)). The court stated that the application of any type of discount is contrary to the requirement that the company be valued as a going concern, and "to fail to accord to a minority shareholder the full proportionate value of his shares imposes a penalty for lack of control, and unfairly enriches the majority shareholders who may reap a windfall from the appraisal process by cashing out a dissenting shareholder, a clearly undesirable result." *Cavalier, supra*, 564 A.2d at 1145.

The American Law Institute also takes the position that in an appraisal action, "[t]he fair value of shares should be the value of the eligible holder's proportionate interest in the corporation, without any discount for minority status or, absent extraordinary circumstances, lack of marketability." A.L.I., *Principles of Corporate Governance* § 7.22 (1994). Like the courts that reject the use of a marketability discount in an appraisal action, the A.L.I. asserts that courts should value a corporation as a whole, not as specific shares, and allocate the value proportionately among the shareholders.

The A.L.I. also gives some insight into what is meant by "extraordinary circumstances":

> Under a very limited exception to the principles set forth in § 7.22(a), the court may determine that a discount reflecting the lack of marketability of shares is appropriate in "extraordinary circumstances." Such circumstances require more than the absence of a trading market in the shares; rather, the court should apply this exception only when it finds that the dissenting shareholder has held out in order to exploit the transaction giving rise to the appraisal so as to divert value to itself that could not be made available proportionately to other shareholders.

*Principles of Corporate Governance, supra*, § 7.22 at 325 (1994). The A.L.I. then postulates an example of "extraordinary circumstances": an illiquid and troubled corporation makes relatively minor changes in its governance and structure; a minority shareholder, who has been unsuccessfully attempting to sell its shares to the majority, elects dissenters' rights; and a "fair value" proceeding is likely to produce an appraisal higher than the remaining shareholders could receive upon a sale of the corporation or its assets. While all of the "elements" of the A.L.I.'s example need not be present in order to constitute an "extraordinary circumstance," it is apparent that, in its view, the marketability discount should be limited to those situations in which the likely appraised "fair value" of a dissenter's share would exceed the value of a remaining share in the corporation and the dissenter is taking advantage of a minor corporate change. The A.L.I. goes on to indicate, however, that, even under the rather extreme circumstances of its example, the marketability discount should not be imposed when the corporate change is fundamental, such as a merger.

The Colorado Business Corporation Act, § 7–101–101, et seq., C.R.S.2000, was based on the Model Business Corporation Act (1990) (Model Act). *See* Colo.Rev.Stat. Ann. tit. 7–101 official cmt.—introductory n. (West 1999). In the current version of the Model Act, the definition of "fair value" has been amended to state that it is to be determined without the application of marketability or minority discounts except under very limited circumstances not present here. Model Act § 13.01(3)(iii) (3d ed.1998–99). The comments state that the amendment adopts the modern view that dissenting shareholders should be awarded their proportional value in the corporation when valued as a whole and not the value of the dissenters' shares when valued alone. Model Act § 13.01 cmt. at 13–10.

We are persuaded by the A.L.I. position and those cases holding that the marketability discount should not be imposed in dissenters' rights actions except in "extraordinary

circumstances." To the extent, if any, *WCM* and *M Life* can be read to reach a contrary conclusion, we decline to follow them.

■ Accordingly, we hold that in determining the "fair value" of a dissenter's shares in a closely held corporation, the trial court must first determine the value of the corporation and the pro rata value of each outstanding share of common or equity participating stock. In the case of a going concern, no minority discount is to be applied; and, except under "extraordinary circumstances," no marketability discount is to be applied.

■ An election to become an S Corp requires the consent of all shareholders in the corporation. 26 U.S.C. § 1363 (2001). Under Colorado law, a merger can be approved by fewer than all shareholders. Sections 7–111–103, 7–117–101(8), C.R.S.2000 (a majority or super majority). Minority shareholders have no control, and very little formal voice, in the financial matters of the corporation, particularly on the determination of whether profits will be distributed as dividends. Therefore, minority shareholders risk state and federal income tax liability without any, or with insufficient, distribution of profits through dividends to pay such liability. In addition, here the S Corp conversion was accomplished by a merger. We conclude, as a matter of law, that the conversion of holding company to an S Corp by merger was not an extraordinary circumstance that triggers an appropriate application of a marketability discount.

Therefore, we remand to the trial court with instructions to enter judgment that the "fair value" of shareholder's shares is $666.16 per share, with appropriate interest.

### III.

Shareholder next contends that the trial court erred by finding that holding company and its directors complied with their statutory and fiduciary obligations. We disagree.

■ The officers, directors, and controlling shareholders of a corporation have a fiduciary duty to act in good faith and in a manner they reasonably believe to be in the best interests of the corporation and its shareholders. *Polk v. Hergert Land & Cattle Co.*, 5 P.3d 402 (Colo.App.2000). In a closely held corporation, the relationship between directors and shareholders is treated like a relationship between partners. Directors owe the highest degree of loyalty and trust to the other shareholders, are required to exercise good faith, and cannot use their power to harm the other shareholders. *River Management Corp. v. Lodge Properties, Inc.*, 829 P.2d 398 (Colo.App.1991). Whether a breach of fiduciary duty has occurred is a question of fact for the trial court to determine. *See Silverberg v. Colantuno*, 991 P.2d 280 (Colo.App.1998).

■ Here, there is nothing in the record indicating that holding company violated its duties to its shareholders. Holding company concluded that restructuring as an S Corp would benefit the corporation and the shareholders. Shareholder dissented. Holding company offered to pay for the shares at a price determined by an outside appraisal, and, when shareholder demanded a higher price, it sought a court's determination of the share's "fair value" in accordance with the applicable statute.

After reviewing the facts and hearing testimony from both parties, the trial court found that holding company had complied with the dissenters' rights statute and with its duties to the corporation and its shareholders. We find no reason to disturb these findings on appeal.

### IV.

Finally, shareholder contends that the trial court abused its discretion by summarily denying that part of shareholder's bill of costs for the computerized legal research and limiting the interest rate to 8%. We agree as to the research costs and disagree as to the interest.

### A.

■ As to costs, § 7–113–302(1), C.R.S. 2000, states that in an appraisal action, the court shall determine all reasonable costs and assess the costs against the corporation unless the dissenter acted arbitrarily, vexa-

tiously, or not in good faith. Section 13–16–122, C.R.S.2000, provides an illustrative but not exclusive list of items that may be recovered as costs. *Cherry Creek School Dist. # 5 v. Voelker,* 859 P.2d 805 (Colo.1993).

▮▮▮▮ Absent a specific prohibition in the statute, a trial court has the discretion to award any reasonable costs requested, including costs for computerized legal research. *Roget v. Grand Pontiac,* 5 P.3d 341 (Colo.App.1999). A court may award costs for computerized legal research if: (1) the client was billed for computerized legal research expenses separately from attorney fees; (2) the computerized legal research was necessary for trial preparation; and (3) the amount requested was reasonable. *Roget v. Grand Pontiac, supra.*

▮▮▮ In this case, shareholder submitted a bill of costs that listed separately the costs associated with computerized legal research, but the trial court, without explanation, held that they were to be included with attorney fees. Therefore, the case must be remanded for reconsideration of shareholder's entitlement to recover computerized legal research expenses as an item of costs. If the three requirements are met, the court may, in its discretion, award these costs. *See Roget v. Grand Pontiac, supra; see also Mackall v. Jalisco Int'l, Inc.,* 28 P.3d 975 (Colo.App. 2001).

### B.

As to interest, § 7–113–301(5), C.R.S.2000, of the dissenters' rights statute provides:

> Each dissenter made a party to the proceeding commenced under subsection (2) of this section is entitled to judgment for the amount, if any, by which the court finds the fair value of the dissenter's shares, plus interest, exceeds the amount paid by the corporation, or for the fair value, plus interest, of the dissenter's shares for which the corporation elected to withhold payment under section 7–113–208.

Section 7–113–101(5), C.R.S.2000, provides: "Interest" means interest from the effective date of the corporate action until the date of payment, at the average rate currently paid by the corporation on its princi-

pal bank loans or, if none, *at the legal rate as specified in section 5–12–101, C.R.S.* (emphasis added)

Section 5–12–101, C.R.S.2000, provides that the legal rate of interest is 8% unless another provision of law provides for another amount. Here, the trial court concluded that holding company had no outstanding debt upon which to base an interest rate. Therefore, the trial court imposed interest at the legal rate of 8%.

▮▮▮ Shareholder argues that holding company wrongfully withheld money from it, and therefore the trial court should have imposed interest based on § 5–12–102(1)(a), C.R.S.2000, which allows interest in an amount that recognizes the gain or benefit realized by the person wrongfully withholding such money. However, interest pursuant to § 5–12–102(1)(a) is not an option under § 7–113–101(5).

Therefore, the judgment is reversed to the extent that minority and marketability discounts were applied and also to the extent that costs for computerized legal research were denied. The judgment is otherwise affirmed. The case is remanded to the trial court for entry of judgment determining the "fair value" of shareholder's shares in holding company to be $666.16 per share, for the award of appropriate interest, and for reconsideration of the award of computerized research costs all in accordance with the views expressed in this opinion.

Judge METZGER and Judge DAVIDSON concur.