BRYNWOOD COMPANY, Petitioner-Appellant, v. STUART A. SCHWEISBERGER *et al.*, Respondents-Appellees.

Second District No. 2—06—1178

Opinion filed July 23, 2009.

Bradley T. Koch and Angela C. Bresnahan, both of Holmstrom & Kennedy, P.C., of Rockford, for appellant.

Thomas H. Boswell, Stephen R. Swofford, and Timothy G. Shelton, all of Hinshaw & Culbertson LLP, of Chicago, for appellees.

JUSTICE HUTCHINSON delivered the opinion of the court:

In December 2002, petitioner, Brynwood Company (Brynwood), filed a statutory appraisal proceeding in the trial court pursuant to section 11.70 of the Business Corporation Act of 1983 (the Act) (805 ILCS 5/11.70 (West 2002)), seeking a judicial determination of the fair value of shares of stock owned by respondents, Stuart A. Schweisberger (Schweisberger), Marilyn B. Schweisberger, Stuart A. Schweisberger as trustee of the Stuart A. Schweisberger Family Trust, and Morgan Stanley Dean Witter, Inc., as custodian for the Stuart A. Schweisberger Individual Retirement Account (IRA). Brynwood appeals from the trial court's judgment that the fair value of the shares

in which Schweisberger held an interest was $60.68 per share and that Brynwood was obliged to pay Schweisberger interest at the rate of 6.75% per annum. Brynwood contends, *inter alia*, that (1) the trial court's determination as to the fair value of the stock was against the manifest weight of the evidence, and (2) the trial court erred when it determined the interest rate to be paid by Brynwood to Schweisberger. Because we hold that the trial court's determination as to the fair value of the stock was against the manifest weight of the evidence, we vacate the trial court's judgment and remand for further proceedings.

The following facts are derived from the parties' stipulated facts and the other evidence introduced at trial. Brynwood was an Illinois corporation that was organized as a C corporation in 1979 and that owned and managed a commercial office building in Rockford. Brynwood was organized for the sole purpose of owning, managing, and leasing office space in this one building. Besides a minimal cash reserve and some negligible personal property, the building was Brynwood's only asset. The shareholders of Brynwood's stock were both tenants and nontenants of the building; there were also tenants of the building who were not shareholders. Brynwood never issued its shareholders dividends; rather, Brynwood's shareholders expected a return on their investment through the appreciation of the value of the building.

Schweisberger was one of the founders of Brynwood, and he owned an accounting firm that was a tenant in Brynwood's building. The building was initially financed through industrial revenue bonds, and Schweisberger served as the borrower's representative for Brynwood throughout the period of time the building was encumbered by the bond indebtedness. Schweisberger also served as Brynwood's president, and he was a member of Brynwood's board of directors (the board) from 1979 through September 2000. Schweisberger was employed as Brynwood's accountant from 1979 through 1994. Schweisberger retired in 1996, and he became a nontenant shareholder at that time. In August 2000, Brynwood paid the industrial revenue bond debt in full, and Schweisberger resigned all of his positions in Brynwood in September 2000.

In 1999 and 2000, while Schweisberger was still a member of the board and as the industrial revenue bonds were maturing, the board began evaluating the future course the corporation should take. The board considered converting Brynwood from a C corporation to an S corporation to avoid taxation at both the corporate and shareholder levels. The board also considered selling the building and dissolving the corporation.

The building was appraised five times during 1999 and 2000, the fair market value ranging from $850,000 to as much as $1.43 million

in September 2000, in connection with the financing of a mortgage loan to Brynwood. In February 2000, Brynwood offered to purchase the shares of any shareholder that wished to sell its shares. In September 2000 and in March 2001, Brynwood purchased the outstanding shares of two shareholders for $42.50 per share.

In August 2001, Schweisberger, now a nontentant shareholder and no longer a member of the board, proposed that the board present a resolution at the September 2001 annual meeting of shareholders. Schweisberger suggested that the board, according to its previous business plans, begin to purchase all shares of the nontenant shareholders, to the extent that Brynwood's refinancing of the building would allow.

In a letter dated September 4, 2001, Brynwood offered to purchase the 4,575 shares of stock in which Schweisberger held an interest for $48.50 per share. In a letter dated October 19, 2001, Schweisberger offered to sell his shares to Brynwood for $62 per share. In a letter dated November 30, 2001, Brynwood offered to purchase Schweisberger's shares for $50 per share. No further written offers to purchase or sell Schweisberger's shares were exchanged.

In a letter dated July 12, 2002, Brynwood informed Schweisberger that it may have an opportunity to sell the building to an unrelated third party named Jay Lipe. The letter also informed Schweisberger that, because of the "large income tax liability that would be paid" upon the sale of the building, "the directors of Brynwood would be willing to forego consideration of the potential sale" and the dissolution of the corporation if he would consent to the conversion of Brynwood from a C corporation to an S corporation. The letter gave Schweisberger until July 17, 2002, to agree to the conversion of Brynwood to an S corporation; Schweisberger declined to give his consent.

On July 29, 2002, the board executed a "Written Consent of the Board of Directors in Lieu of a Meeting," which recommended the sale of the building for $1.4 million, on or before August 9, 2002, in accordance with the terms of Lipe's proposed real estate contract. The board also called a special meeting of the shareholders to consider and vote on the sale of the building and the dissolution of the corporation, to be held on August 5, 2002. Brynwood provided Schweisberger with a "Notice of Special Meeting of Shareholders" and with a "Notice of Intent to Execute Less Than Unanimous Consent of Shareholders." The notice of intent indicated that all of the shareholders of Brynwood, other than Schweisberger, intended to approve the board's proposal to sell the building to Lipe and to dissolve the corporation.

On July 30, 2002, the board executed the real estate sales contract to sell the building to Lipe. All of the tenants of the building executed

new five-year leases that reflected Lipe as the landlord. Brynwood provided Schweisberger with a copy of the contract.

On August 5, 2002, all of the shareholders of Brynwood, other than Schweisberger, executed a "Written Consent of the Shareholders in Lieu of a Meeting," in which they approved the board's recommendation to sell the building and to dissolve the corporation. Brynwood provided Schweisberger with a "Notice of Execution of Less than Unanimous Consent of Shareholders," which informed him that all of the other shareholders had voted to approve the sale of the building and the dissolution of the corporation.

On August 7, 2002, Brynwood and Lipe closed on the sale of the building for $1.4 million. The mortgage loan from Alpine Bank in the amount of $353,080 was paid in full from the proceeds of the sale. The interest rate on that loan was 6.75% per annum, and the loan was Brynwood's only bank loan. A broker's commission fee of $49,000 and $3,231 in closing costs were also paid from the proceeds of the sale at closing. Brynwood deposited the net cash proceeds from the sale of the building into a certificate of deposit at Alpine Bank, earning 2.3% interest per annum.

Brynwood recognized capital gains on the sale of the building in the amount of $959,282. Brynwood incurred and paid $13,419.23 in attorney fees in connection with the sale of the building and the dissolution of the corporation. Brynwood incurred and paid $14,550 in accounting fees in connection with the preparation of the June 30, 2002, year-end financial statements and income tax returns, the sale of the building, and the dissolution of the corporation. Brynwood incurred and paid $294,271 in federal income taxes and $66,872 in state income taxes for the fiscal year ending June 30, 2003, and it paid $5,250 in accounting fees for the preparation of the June 30, 2003, year-end financial statements and income tax returns. Excluding the mortgage loan payoff, the total of all of these taxes, professional fees, and other costs associated with the sale of the building and the dissolution of the corporation totaled approximately $446,593.

At the time of the closing on the sale of Brynwood's building, there were 17,750 shares of common stock issued and outstanding. Schweisberger owned an interest in 4,575 shares (approximately 26%); Klaas & Schou Management, LLC, owned 2,500 shares (approximately 14%); Lobdell & Hall, Inc., owned 2,475 shares (approximately 14%); Nicola E. Daniels owned 2,200 shares (approximately 12%); and Kurt F. Jenson, Richard K. Usedom, and William G. Shold each owned 2,000 shares (approximately 11% each).

On August 16, 2002, Schweisberger provided a "Notice of Dissenter's Rights" to Brynwood. The notice informed Brynwood that

Schweisberger objected to the sale of the building, and it demanded that Brynwood pay Schweisberger the "fair value" of his shares pursuant to section 11.70 of the Act (805 ILCS 5/11.70 (West 2002)).

On August 19, 2002, Brynwood filed articles of dissolution with the Illinois Secretary of State. On September 13, 2002, Brynwood provided Schweisberger with its "Estimate of Fair Value" of the stock; Brynwood's estimate of fair value was $30.08 per share.

On October 8, 2002, Schweisberger provided Brynwood with his "Estimate of Fair Value" of the stock; Schweisberger's estimate of fair value was $66.31 per share. Schweisberger demanded that Brynwood pay him that amount as well as 6.75% interest, the rate of interest that Brynwood had paid on its mortgage to Alpine Bank.

On October 24, 2002, Schweisberger requested payment for his shares of stock at Brynwood's estimate of fair value, and he surrendered his stock certificates with the request. On October 25, 2002, Brynwood paid Schweisberger $138,256.95, representing $30.08 for each share owned, as well as interest at the rate of 2.3% from the date of the closing on the sale of the building, August 7, 2002, through September 15, 2002, and at the rate of 1.95% from September 16 through October 25, 2002. The interest rates were what Brynwood was earning on the certificate of deposit that held the proceeds from the sale of the building.

On December 6, 2002, Brynwood filed a petition for determination of fair value in the trial court. Brynwood's petition requested that the trial court make a judicial determination of the "fair value" of Schweisberger's shares of stock and the amount of interest due in accordance with section 11.70 of the Act (805 ILCS 5/11.70 (West 2002)).

Prior to trial, Brynwood filed a motion to bar the testimony of Schweisberger's expert witness, Mark Patterson. Brynwood argued that Patterson's proffered testimony would not assist the trial court in its determination of fair value, because Patterson's proffered testimony would elicit only his interpretation of the term "fair value" under the Act. Brynwood asserted that allowing the testimony of Patterson would be improper because "expert testimony is not admissible as to the meaning of a statutory term" and because "Patterson had no experience with the determination of 'fair value' under [the Act] and is therefore not qualified to render [an expert opinion] in that regard." The trial court denied Brynwood's motion.

On February 2 and 3, 2006, the trial court conducted a bench trial. Brynwood called William Shold, a member of the board, to testify. Shold testified that, at a July 2002 board meeting, although the board became aware that Lipe was interested in purchasing the building for $1.4 million, the board preferred to convert Brynwood to an S corpora-

tion and to hold the building for 10 years to take advantage of the tax savings from such a conversion.

Shold further testified that the board was aware that Schweisberger held some of his Brynwood stock in an IRA and that he would need to transfer those shares because an IRA was not qualified to own shares in an S corporation. Shold testified that Lobdell & Hall, another shareholder in Brynwood, would also have been required to change the status of its corporation to allow the S corporation status change in Brynwood, and that it had agreed to do so. Shold testified that the board decided that Schweisberger would be given until July 17, 2002, to agree to the conversion to S corporation status. Shold testified that the board further decided that, in the event Schweisberger refused to allow the status change, the board would sell the building for near the appraised value and dissolve the corporation, because that would have provided the most value for the shareholders.

The trial court heard the opinions of three expert witnesses regarding the fair value of Schweisberger's shares. Brynwood called Gary Randles, a certified public accountant. Randles testified that he had been employed as Brynwood's accountant since 1997 and that Brynwood was one of several closely held corporations with which he had worked over the years. Randles opined that, where a business was closely held and where its only asset was a single parcel of real estate, the most tax advantageous business structure would be a partnership, a limited liability company, or an S corporation, as opposed to a C corporation. Randles explained that he would recommend those business structures over a C corporation so that the shareholders would avoid "double taxation" at both the corporate and individual levels upon the disposition of the real estate. Randles testified that, had Lobdell & Hall and Schweisberger agreed to change the business structures in which their stock was held, allowing Brynwood to elect S corporation status, Brynwood would have been required to hold the property for 10 years before it would avoid paying the capital gains tax on the appreciation between the cost basis of the building and the sales price of the building.

Randles opined that the tax burden in the event of the sale of the building should be considered and deducted in calculating the fair value of Brynwood's stock. He explained that, because Brynwood was a single-asset company, with that asset being real estate, the value of the stock in the company to the shareholder must be determined by calculating what the shareholder eventually received as an individual. As a C corporation, Brynwood was required to pay the corporate level tax upon the appreciation in value of the building, and the remaining cash would then be distributed to the shareholders, who were also

required to pay individual income tax on the distribution. For those reasons, Randles concluded that the tax liability should be considered in determining the value of Brynwood's stock "at all times."

Randles testified that he calculated the fair value of Schweisberger's stock, considering the purchase price of the building at $1.4 million and the financial records of the corporation. Based upon his review, he established that the fair value of all shares, including those in which Schweisberger had an interest, was $36.15 per share. Randles arrived at that figure by deducting from the sales price of the building the capital gains taxes, professional fees, and other costs associated with the sale of the building and the dissolution of the corporation. Randles maintained that this calculation revealed the net asset value of the shares of stock in Brynwood. Randles opined that it would be inequitable for any shareholder to receive more or less than $36.15 per share, because that was the figure that represented what the shareholders would ultimately receive upon the sale of the building and the dissolution of the corporation. Randles testified that, if Schweisberger were to be paid his fair value figure of $66.31 per share, the remaining shareholders would receive approximately $25 per share, a result that Randles opined would be inequitable because it would not treat all of the shareholders equally.

On cross-examination, Randles testified that he had previously calculated the value of Schweisberger's shares in March 2002 at the request of Brynwood's attorney, when Brynwood and Schweisberger were negotiating the purchase of his shares. Brynwood objected to the introduction of any evidence relating to those negotiations between the parties. Brynwood argued that offers of compromise or settlement of a dispute between the parties were improper evidence to be considered by the trial court. The trial court overruled the objection, explaining that, in a bench trial, it could exclude evidence that appeared to be a negotiation or an offer as opposed to a valuation technique.

Randles explained that, under Brynwood's business model, "fair value comes down to *** the liquidation value." Randles testified that, for tax purposes, and for a C corporation, selling the building was "the same as selling widgets: Brynwood would have paid the same tax rate, 39% combined federal and state tax, if it had made the same profit, regardless if it was a profit from the sale of the building or from the sale of widgets."

Brynwood renewed its objection and filed a motion to exclude evidence of the offers between the parties related to the purchase of Schweisberger's shares by Brynwood in 2001 and 2002. Brynwood argued that the evidence indicated that a dispute between the parties

became apparent in 2000 in relation to the value of Schweisberger's shares in the corporation and the value of the building. Brynwood further argued that a dispute between the parties was apparent when both parties hired attorneys to represent them and when Schweisberger's attorney wrote a letter in January 2002 that threatened litigation against Brynwood. Brynwood argued that offers of settlement and compromise between parties were not admissible at trial, and therefore such evidence should not be introduced at trial or considered by the trial court.

Schweisberger responded that the rule against introducing evidence of offers of compromise was to avoid tainting a jury's perspective as to liability, and that this situation was not present in the instant case. Schweisberger argued further that there was no question of liability in the present case but, rather, only a question as to the fair value of Schweisberger's shares. Schweisberger argued that, for those reasons, Illinois courts allowed evidence of offers and negotiations in fair value cases. The trial court stated that it would rule on the evidence of the offers between the parties on an "instance by instance" basis so that it could consider the specific evidence being offered in each specific context prior to making its decision.

Schweisberger testified as an expert witness on his own behalf. Schweisberger testified that Shold called him in April 2001 and told him that Brynwood was ready "to buy him out." Schweisberger testified that Shold called him again in July 2002 to discuss his willingness to allow the corporation to elect S corporation status. Schweisberger declined to agree to the change and explained that his IRA owned some of the shares of his stock and that an IRA was not qualified to hold stock in an S corporation. Schweisberger further explained that he would have been required to transfer shares out of the IRA, further requiring an appraisal of Brynwood at his expense and requiring that he pay individual income taxes on the withdrawal from the IRA. Schweisberger acknowledged that he had conversations with other board members from 1996 through 2001 regarding whether the corporation should change to S corporation status, and acknowledged that he initially told the other board members that a change to S corporation status would save the shareholders money through a tax advantage.

Schweisberger testified that he had calculated the fair value of the stock in Brynwood as of August 6, 2002, the day before the closing on the sale. He opined that the fair value was $66.31 per share. He testified that, because he dissented from the sale of the building, he believed that he was not obligated to pay his share of the capital gains taxes on the building, because the taxes were a contingent liability

realized only upon the sale of the building. Schweisberger testified that he also excluded the professional fees and costs associated with the sale of the building and the dissolution of the corporation because, in his opinion, it was for the trial court to decide those matters.

On cross-examination, Schweisberger acknowledged that he could have avoided individual tax liability incurred as a result of transferring the stock from his IRA if he would have deposited the cash value equivalent of the stock into the account prior to the transfer. Schweisberger also acknowledged that, when he served as Brynwood's accountant, he had prepared a document entitled "Effect of Building Sale" for a June 27, 1995, board meeting. In this document Schweisberger calculated the per-share price that shareholders could expect to realize if the building were sold at three hypothetical sales prices. Schweisberger admitted that his calculations included deductions for the closing costs and capital gains taxes associated with the sale of the building, and Schweisberger acknowledged that, at that time, he thought it was appropriate to include those deductions.

Schweisberger next called Mark Patterson to testify as an expert witness. Patterson testified that he had earned a bachelor's degree in business administration, with an emphasis in accounting, and a master of science degree in taxation. Patterson testified that he had earned a specialty accreditation in business valuation through the accounting industry's national profession trade organization, the American Institute of Certified Public Accountants. Patterson testified that he had practiced as a certified public accountant for 23 years and had performed numerous business valuations prior to testifying in the present case. Patterson testified that he was employed as the tax director of Robert Ferrill and Associates, an accounting firm. Patterson's accounting experience was primarily as a tax advisor and planner for small, closely held companies and in valuing companies that owned real estate as a portion of their assets.

Patterson testified that Schweisberger retained him to give his opinion as to which valuation methodology the trial court should employ in determining the fair value of the shares in which Schweisberger held an interest. Patterson testified that Schweisberger had also retained him to give his opinion as to whether the trial court should deduct the capital gains taxes and the costs of the sale of the building and the dissolution of the corporation in its calculation of fair value.

Patterson testified that, to determine the fair value of Brynwood's shares, the trial court would be required to conduct a business valuation. To conduct a proper business valuation, Patterson testified, one must first decide what valuation date should be used and which defini-

tion of "value" should be employed. Patterson explained that a "fair value" definition of value was not necessarily synonymous with a "fair market value" definition of value. Patterson further testified that two "premises of value" should be considered when valuing a business: a "going concern" premise of value and a "liquidation" premise of value. Patterson testified that there were a number of "standards of value" that should be considered when valuing a business. Some of the most common standards were "net asset value," "income value," and "fair market value."

Patterson testified that he relied on general business valuation texts and trade articles. He also explained that, because this valuation was to be conducted in the context of an appraisal proceeding, he reviewed the relevant text of the Act, legal opinions, and scholarly articles. In determining the appropriate valuation date to be employed, Patterson opined that he would conduct the valuation as of August 5, 2002, the date the directors and majority shareholders resolved to sell the building and to dissolve the corporation. Patterson opined that the resolution to sell the building and to dissolve the corporation was the corporate action from which Schweisberger dissented, and as such, the date of that resolution was the date to be employed in conducting a valuation of Brynwood.

In determining the applicable definition of value the trial court should employ, Patterson opined that "fair value," as expressed in the Act, was the definition of value to be employed. As to the premise of value to be employed, Patterson opined that the trial court should employ a "going concern" premise of value rather than a "liquidation" premise of value. Patterson explained that the reason he chose a "going concern" premise of value was that Brynwood was in good financial condition at the time it decided to sell the building. Patterson opined that, under the "going concern" premise of value, the capital gains taxes, fees, and costs triggered by the closing on the sale of the building should not be deducted when calculating the fair value of Schweisberger's shares, because those expenses would not have accrued but for the actions of Brynwood, and Schweisberger had dissented from those actions. For the same reasons, Patterson opined that the fees and costs associated with dissolving the corporation should not be deducted. On cross-examination, Patterson acknowledged he had never valued a closely held, single-asset corporation such as Brynwood, where the asset was a parcel of real estate.

Brynwood renewed its objection to the trial court's acceptance of Patterson as an expert witness and to the admission of his testimony. The trial court denied the motion to bar Patterson's testimony. The trial court stated that it would give Patterson's testimony the ap-

propriate weight in its determination, but the trial court believed that the testimony was admissible and relevant to its fair value determination.

The parties submitted written closing arguments. On October 18, 2006, the trial court issued its memorandum of decision. The trial court found that Schweisberger timely exercised his right to dissent from the August 7, 2002, sale. The trial court found that Randles, Schweisberger, and Patterson were all qualified to offer opinions of valuation. With respect to determining fair value of Schweisberger's shares, the trial court found that the operative date for measuring fair value was August 6, 2002, the day prior to the sale on August 7, 2002.

The trial court next determined whether equity required that Schweisberger's shares be assessed with the financial liabilities that resulted from the sale of the building. In evaluating Schweisberger's shares, the trial court adopted the premise that Brynwood was a "going concern." The trial court noted that Brynwood's action to sell the building was legal and within its authority, but that the action occurred with Brynwood's knowledge that Schweisberger dissented from the decision to sell the building and that selling the building would trigger a capital gains liability and accompanying costs and professional fees for the corporation.

The trial court held that, based on the above and its finding that there were no compelling financial reasons for the sale other than the majority's desire for the sale, exempting Schweisberger's shares from the tax liabilities, costs, and fees incurred from the sale of the building and the dissolution of the corporation was not inequitable.

With respect to the interest rate to be applied, the trial court used August 6, 2002, as the operative date for measuring the fair value of Schweisberger's shares. The trial court found that the interest rate should be 6.75% because that was Brynwood's rate in effect at the time Alpine Bank was holding the mortgage on the building.

The trial court determined that the fair market value of the building was for what it sold, $1.4 million. The trial court held that the fair value of Brynwood was $60.68 per share. It added the value of the building, $1.4 million, and its other assets, $41,738, which totaled $1,441,738. From that total, the trial court deducted the amount of the mortgage, $352,882, and other liabilities, $11,784, to reach a net asset value of $1,077,072. The trial court's calculations thus reflected that, based on the number of outstanding shares, 17,750, the value of Brynwood was $60.68 per share.

Thereafter, on October 19, 2006, the trial court entered judgment in favor of Schweisberger and against Brynwood in the amount of $181,130.45, representing the difference between the trial court's

$60.68 per share value and the $138,256.94, or $30.08 per share value plus 2.3% interest, that Brynwood initially paid to Schweisberger in October 2002. Brynwood timely appealed.

Brynwood seeks reversal of the trial court's judgment. Brynwood makes two challenges to the trial court's judgment: (1) the trial court's finding as to the fair value of Schweisberger's shares at $60.68 each was against the manifest weight of the evidence, and (2) the trial court's application of a 6.75% interest rate was erroneous. Our general standard of review following a bench trial is that the judgment will not be set aside unless it is against the manifest weight of the evidence. *Weigel Broadcasting Co. v. Smith*, 289 Ill. App. 3d 602, 607 (1996). A decision is said to be against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence presented. *Best v. Best*, 223 Ill. 2d 342, 350 (2006).

In support of its challenge to the trial court's finding of fair value, Brynwood argues that the trial court's finding was against the manifest weight of the evidence because it failed to deduct the capital gains taxes, professional fees, and other costs associated with the sale of the building and the dissolution of the corporation. Specifically, Brynwood asserts, *inter alia*, that (1) the trial court's determination resulted in an inequitable transfer of wealth from the majority to the minority contrary to the purpose of the Act, and (2) the trial court's interpretation of fair value under section 11.70 of the Act (805 ILCS 5/11.70 (West 2002)) created a conflict with section 12.30 of the Act (805 ILCS 5/12.30 (West 2002)), which deals with the priority of creditors' rights upon the dissolution of a corporation.

Brynwood's argument pertaining to the trial court's finding of fair value is meritorious. Brynwood argues that the trial court's failure to deduct capital gains taxes, professional fees, and costs incurred by the sale of the building and the dissolution of the corporation was against the manifest weight of the evidence because it resulted in an artificial inflation of the value of the shares and resulted in a windfall to Schweisberger at the majority's expense. Brynwood asserts that the trial court's determination as to the fair value of Schweisberger's shares was inequitable, in that it permitted the dissenting shareholder to, "in effect, enjoy the benefit of the sale of the [b]uilding at its fair market value without being required to share in the burdens related to the sale with the [majority] shareholders." Brynwood asserts that the trial court's construction of fair value is inconsistent with the purpose of the Act, which is to ensure that all shareholders are treated fairly and equally. Brynwood urges that the trial court's construction of fair value would encourage shareholders of a corporation to dissent

and "[r]ather than protecting minority shareholders from oppression, *** [would] foster and promote the veritable gamesmanship and corporate gridlock that the statute was enacted to remedy."

Schweisberger responds that the capital gains taxes, professional fees, and costs were properly excluded from the calculation of fair value because, as a dissenting shareholder, Schweisberger was entitled to receive the proportionate value of his shares in Brynwood as a "going concern" as of August 6, 2002, the day prior to the sale of the building on August 7, 2002. Schweisberger asserts that, as of August 6, capital gains taxes, professional fees, and costs had not yet been incurred and, therefore, should not have been considered in calculating fair value. Relying on *Institutional Equipment & Interiors, Inc. v. Hughes*, 204 Ill. App. 3d 922 (1990), *Hansen v. 75 Ranch Co.*, 1998 MT 77, 288 Mont. 310, 957 P.2d 32, *Perlman v. Permonite Manufacturing Co.*, 568 F. Supp. 222 (D.C. Ind. 1983), *In re Glosser Brothers, Inc.*, 382 Pa. Super. 177, 555 A.2d 129 (1989), and *In re 75,629 Shares of Common Stock of Trapp Family Lodge, Inc.*, 169 Vt. 82, 725 A.2d 927 (1999), Schweisberger further asserts that Brynwood's proposed calculation, in deducting the capital gains taxes, professional fees, and costs, amounts to a calculation of "fair market value" of a corporation in the process of liquidation rather than "fair value" of a going concern, and is therefore the incorrect standard to be applied under the dissenters' rights statute. Schweisberger concludes by simply stating that there was no equitable reason for the trial court to have deducted the taxes, fees, and costs.

■ Again, our standard of review is whether the trial court's conclusions were against the manifest weight of the evidence. *Weigel Broadcasting*, 289 Ill. App. 3d at 606, citing *Stanton v. Republic Bank of South Chicago*, 144 Ill. 2d 472, 479 (1991). In an appraisal proceeding brought pursuant to the dissenters' rights statute, the trial court must determine the "fair value" of a dissenting party's shares in the corporation. See 805 ILCS 5/11.70(h) (West 2002) (stating that "[e]ach dissenter made a party to the proceeding is entitled to judgment for the amount, if any, by which the court finds that the fair value of his or her shares, plus interest, exceeds the amount paid by the corporation or the proceeds of sale by the shareholder, whichever amount is applicable"). Section 11.70(j)(1) of the Act defines "fair value" as follows:

" 'Fair value', with respect to a dissenter's shares, means the value of the shares immediately before the consummation of the corporate action to which the dissenter objects excluding any appreciation or depreciation in anticipation of the corporate action, unless exclusion would be inequitable." 805 ILCS 5/11.70(j)(1) (West 2002).

■ Illinois reviewing courts have stated that there is no precise formula for valuing the stock in a corporation, and a trial court is to consider " '[e]very relevant evidential fact and circumstance entering into the value of the corporate property and reflecting itself in the worth' " of a dissenter's shares. *Stewart v. D.J. Stewart & Co.*, 37 Ill. App. 3d 848, 853 (1976), quoting *Ahlenius v. Bunn & Humphreys, Inc.*, 358 Ill. 155, 168 (1934). A relevant factor is anything that might impact on the stock's intrinsic value. *Weigel Broadcasting*, 289 Ill. App. 3d at 607, citing *Independence Tube Corp. v. Levine*, 179 Ill. App. 3d 911, 917 (1988). Some of the factors that may be relevant to a determination of fair value include the stock's market price, the corporation's earning capacity, the investment value of the shares, the nature of the business and its history, the economic outlook of the business and the industry, the book value of the corporation, the corporation's dividend paying capacity, and the market price of stock of similar businesses in the industry. *Weigel Broadcasting*, 289 Ill. App. 3d at 607, citing *Stanton*, 144 Ill. 2d at 479; *Kalabogias v. Georgou*, 254 Ill. App. 3d 740, 748 (1993). Although "fair value" is not synonymous with "fair market value," fair market value is another relevant factor to be considered. *Weigel Broadcasting*, 289 Ill. App. 3d at 608.

■ While no Illinois court has so held, other jurisdictions agree that dissenters' rights statutes that employ the term "fair value" require the trial court to value the dissenting shares by looking at what they represent—a percentage ownership in the intrinsic value of the corporation as a going concern. See, *e.g.*, *Pueblo Bancorporation v. Lindoe, Inc.*, 63 P.3d 353, 364 (Colo. 2003). "Intrinsic value" is defined as "[t]he true, inherent and essential value of [a] thing. *** The value of the thing itself, rather than any special features which make its market value different." Black's Law Dictionary 739 (5th ed. 1979). Any facts that were known or that could be ascertained as of the date of the corporate action are "not only pertinent to an inquiry as to the value of the dissenting stockholder's interest, but must be considered" in fixing the value. *Paskill Corp. v. Alcoma Corp.*, 747 A.2d 549, 555 (Del. 2000). With these additional principles in mind, we will consider the appropriateness of the trial court's fair value determination in the present case.

Ultimately, making a fair value determination is a fact-specific endeavor requiring the trial court to make an independent appraisal of the corporation, taking into account all recognized methods of valuation, whether or not advanced by the parties. *M.G. Bancorporation v. Le Beau*, 737 A.2d 513, 526-27 (Del. 1999). In valuing a corporation to make a fair value determination as to a dissenter's shares, "the

important thing to bear in mind is that value of stock in a going concern is to be measured in terms of [the shareholders'] ability to realize that value." *Tri-Continental Corp. v. Battye*, 31 Del. Ch. 523, 535, 74 A.2d 71, 76 (1950). As previously stated, a trial court's finding as to fair value will not be set aside unless it is against the manifest weight of the evidence. *Weigel Broadcasting*, 289 Ill. App. 3d at 607. A decision is said to be against the manifest weight of the evidence where the opposite conclusion is clearly evident or where the finding is unreasonable, arbitrary, or not based on the evidence presented. *Best*, 223 Ill. 2d at 350.

■ On our review of the record, we conclude that the trial court's determination as to the fair value of Schweisberger's shares in Brynwood, without deducting the capital gains taxes, professional fees, and other costs associated with the sale of the building, was against the manifest weight of the evidence. Specifically, the trial court's determination as to fair value did not recognize that "the equities" in the present case supported a deduction for the capital gains taxes, professional fees, and other costs incurred upon the sale of the building, and therefore the court's ruling did not effectuate the purpose of the statute.

Schweisberger's ability to monetize, or realize, the investment value of his ownership interest in the true, intrinsic value of Brynwood as a going concern was affected by its inherent and unique nature as a closely held corporation. See, *e.g.*, *Pro Finish USA, Ltd. v. Johnson*, 204 Ariz. 257, 259, 63 P.3d 288, 290 (App. 2003) (recognizing that determining the fair value of a closely held corporation is especially challenging due to the lack of information regarding value that is usually available in the market for publically traded stock). As investors in a closely held corporation, Brynwood's shareholders did not have an open and available market in which they could sell their shares of stock for cash. Therefore, the shareholders had only a limited number of ways in which they could monetize their investment in the corporation. For example, the shareholders could have individually engaged in private sales of their shares, either with other individuals or entities interested in becoming shareholders of Brynwood, or with Brynwood itself. In addition, the shareholders could have collectively decided to sell the appreciated asset and take a full distribution from the proceeds of the sale. However, whether a shareholder decided to monetize the investment through a private sale or through the sale of the building, a proper calculation of the true, intrinsic value of the shareholder's percentage ownership should have necessarily taken into account all of the previously detailed foreseeable and ascertainable transactional costs that were known and inherent in the unique

nature of Brynwood and its business as a closely held C corporation whose business was to hold a single parcel of real estate for its appreciated value. See, *e.g.*, *Tri-Continental*, 31 Del. Ch. at 535, 74 A.2d at 77 (taking into account the element of discount due to the peculiar nature of the corporation as a regulated, closed end holding company).

In the investment world, "transaction costs" are defined as the "cost of buying or selling a security, which consists mainly of the brokerage commission, the dealer markdown or markup, or fee \*\*\* but also includes direct taxes, such as the SEC fee, any state-imposed transfer taxes, or other direct taxes." (Emphasis omitted.) Barron's Dictionary of Finance Investment Terms 659 (5th ed. 1998). As it applies to the instant case, the transaction costs inherent in selling Brynwood's only asset, the building, necessarily included the taxes, fees, and other costs. Therefore, the true, intrinsic value of Schweisberger's percentage ownership would not, and could not, have been, as the trial court found, a strict percentage interest in the $1.4 million fair market value of the building, because the fair market value of the building could not have been realized without also incurring the transaction costs, that is, the known, foreseeable, and ascertainable capital gains taxes, professional fees, and other costs. See, *e.g.*, *Tri-Continental*, 31 Del. Ch. at 535, 72 A.2d at 77 (holding that trial court was required to apply element of discount to determine true or intrinsic value of the stock). Again, the capital gains taxes, professional fees, and costs were known and inherent in the unique nature and business of Brynwood from its inception. They were intimately tied to the true and intrinsic value of the corporation as a whole, and correspondingly, to the investment value of each of the shareholders' interest in the corporation.

Significantly, that the capital gains taxes, professional fees, and other costs were intimately tied to the true and intrinsic value of the corporation as a whole, and correspondingly, to the fair value of all of Brynwood's shareholders' stock was true regardless of whether Brynwood subsequently dissolved the corporation and distributed the proceeds of the sale to its shareholders or whether it reinvested the proceeds in another asset and continued in business as a going concern. In other words, a fair value calculation of all of the shares in Brynwood, as a going concern and immediately before the closing on the building, must include an adjustment to the net asset value of the corporation to account for the known, foreseeable, and ascertainable capital gains taxes, professional fees, and other costs incurred as a result of the shareholders obtaining their investment value in Brynwood through the sale of the building. See *Tri-Continental*, 31 Del. Ch. at 534, 74 A.2d at 76. Deducting the amount of capital gains taxes, professional fees, and other costs associated with the sale of the build-

ing from Brynwood's net asset value will result in the true, inherent, and intrinsic value of the corporation as a going concern. See, *e.g.*, *Pueblo Bancorporation*, 63 P.3d at 360, 364 (requiring the trial court to value the dissenting shares by looking at what they represent—a percentage ownership in the intrinsic value of the corporation as a going concern). As the capital gains taxes, professional fees, and other costs "were known or could have been ascertained" immediately before the closing, they were not only pertinent to the trial court's fair value inquiry but were required to be taken into account in determining fair value under the facts of this case. *Weigel Broadcasting*, 289 Ill. App. 3d at 607; *Paskill*, 747 A.2d at 555; *Tri-Continental*, 31 Del. Ch. at 534, 74 A.2d at 76. The trial court's failure to properly account for the taxes, professional fees, and costs in its calculation of the fair value of Schweisberger's shares was "to fail to face the economic facts and to commit error." *Tri-Continental*, 31 Del. Ch. at 534, 74 A.2d at 76.

Our conclusion that the capital gains taxes, professional fees, and other costs associated with the sale of the building must be deducted from Brynwood's net asset value is supported by a consideration of the trial court's duty to effectuate the purpose of the statute and is consistent with the equities of the situation presented. As previously stated, depending on the nature of the transaction that led to the appraisal proceeding, the goals of dissenters' rights statutes today are to protect minority shareholders from majority overreaching, self-dealing, and oppressive conduct in an attempt to eliminate a minority shareholder at a price below fair value, or in an attempt to transfer power to the majority. See *Brown v. Arp & Hammond Hardware Co.*, 2006 WY 107, ¶24-25, 141 P.3d 673, 680-81 (Wyo. 2006). Sitting in equity, the trial court is to ensure that the valuation conducted results in an outcome that is fair and equitable to all parties. See *Rainforest Café, Inc. v. State of Wisconsin Investment Board*, 677 N.W.2d 443, 450 (Minn. App. 2002).

In the present case, Schweisberger was not the victim of majority overreaching in an attempt to eliminate him from the corporation at a price below fair value or in an attempt to usurp the voting power of his shares. Rather, after Schweisberger retired from his accounting practice, moved out of the building, and resigned his corporate positions with Brynwood, he made the decision that he no longer wanted to be a shareholder of Brynwood and he engaged Brynwood's board in negotiations regarding the purchase of his stock. The board offered a per share price of $48.50 in September 2001 and $50 in November 2001, neither price alleged to be unfair by Schweisberger. We note that these offers were substantially higher than the $42.50 per share that

Brynwood had paid to purchase the shares of two other nontenant shareholders in September 2000 and March 2001. While those negotiations were ongoing, the board and the majority of Brynwood's shareholders made an investment decision to sell the building at a price that they all considered to be at or above fair market value in an arm's-length transaction and to dissolve the corporation. See *Brown*, 2006 WY 107, ¶24, 141 P.3d 673, quoting F. O'Neal & R. Thompson, O'Neal & Thompson's Oppression of Minority Shareholders & LLC Members §5:11, at 5—90 (2d ed. 2002) (stating that it is now recognized by the courts and commentators that " '[a] transaction in which the majority shareholder is forcing the minority shareholder out of the enterprise at a price chosen by the majority is fundamentally different from the minority's voluntary decision to abandon the enterprise because of a business change proposed by the majority' "); see also *Pro Finish*, 204 Ariz. at 261, 63 P.3d at 292, quoting 2 ALI, *Principles of Corporate Governance: Analysis & Recommendations* §7.22(b) & Comment *c*, at 302-04 (1994) (stating, because " 'management generally has every incentive to obtain the highest possible price in a true arms-length transaction,' " " 'the aggregate price accepted by the board of directors *** should be presumed to represent the fair value *** of the assets sold in the case of an asset sale, unless the opposing party can prove otherwise by clear and convincing evidence' "). That decision was made only after Brynwood gave Schweisberger the option to continue his participation in the corporation, as an S corporation. Parenthetically, we further note that, because Schweisberger owned 26% of the stock in Brynwood, had even one other shareholder agreed with him that selling the building would not provide the shareholders with the best return on their investment in the C corporation, this transaction would not have taken place, because Brynwood would not have been able to garner the two-thirds majority vote required by the Act. See 805 ILCS 5/11.60(c), (e) (West 2002). While no one disputes Schweisberger's right to dissent from the corporate action here and to be paid fair value for his shares, there is nothing regarding the relationship between these parties or the details of the transaction with Lipe that would indicate overreaching, self-dealing, or oppressive conduct on the part of Brynwood in this case.

In further assessing the equities of the present case, we note that it was Schweisberger who, in effect, "trapped in" the capital gains tax liability for all of the shareholders when he declined to allow Brynwood to convert from a C corporation to an S corporation. Schweisberger's attorney had received a letter from Brynwood's attorney indicating that Brynwood would forgo the sale of the building if Schweisberger would allow the status conversion. Yet, as he acknowl-

edged on cross-examination, Schweisberger declined to allow the conversion despite his knowledge that the board would sell the building and despite his knowledge that he could have avoided personal tax liability by transferring the cash equivalent of the shares held in his IRA prior to withdrawing the shares. As Schweisberger's decision effectively triggered the capital gains tax consequences and the costs of the sale of the building for all of Brynwood's shareholders, an outcome that is fair and equitable to all parties will be achieved by conducting a valuation in accord with the principles stated above. See *Bogosian v. Woloohojian Realty Corp.*, 158 F.3d 1, 7 (1st Cir. 1998) (finding shareholder of closely held corporation who filed action to force corporation to dissolve or to pay fair value of her shares was "in no position to avoid the full consequences of her choice" and was responsible for proportionate share of capital gains tax liability triggered by the corporation's need to sell property in order to pay her fair value).

For the above reasons, we conclude that the Act's purpose was thwarted when the trial court crafted a resolution that was not fair or equitable to all of Brynwood's shareholders. Accordingly, we conclude that the trial court's determination as to the fair value of Schweisberger's shares was unreasonable and not based on the evidence presented. See *Best*, 223 Ill. 2d at 350. We therefore hold that the trial court's judgment was contrary to the manifest weight of the evidence, and we vacate its order. See *Weigel Broadcasting*, 289 Ill. App. 3d at 607.

In so holding, we reject Schweisberger's assertion that deducting the capital gains taxes, professional fees, and other costs associated with the sale of the building would be improper because they had not yet been incurred the day prior to the sale of the building. As previously detailed, the pivotal question is what Brynwood's intrinsic or inherent value as a going concern was on the day prior to the corporate action from which the dissenter objected, taking into account the unique nature and history of the corporation and its business. See *Pueblo Bancorporation*, 63 P.3d at 360, 364. It was incumbent upon the trial court to consider all facts that were pertinent to the valuation inquiry and that were known or could have been ascertained as of the date of the corporate action. See *Paskill*, 747 A.2d at 555. The tax rates and all of the other financial information related to the sale of the building were known long before and immediately before the closing on the sale of the building, and as previously detailed, were pertinent to the valuation inquiry.

We also reject Schweisberger's argument that deducting the capital gains taxes, professional fees, and costs associated with the sale of the

building amounts to a calculation of "fair market value" of his shares, a standard of value that was rejected in *Institutional Equipment & Interiors, Inc.*, 204 Ill. App. 3d 922. In support of his argument, Schweisberger quotes the following passage from *Institutional Equipment*:

> "[T]he trial court properly refused to use the fair-market-value approach in [its] determination of per-share value. Fair-market value is based on the price that would be agreed upon in an arm's-length transaction between a willing buyer and a willing seller on the open market, neither under a compulsion to act, and both parties possessed of all relevant facts. The trial court correctly held that the fair-market-value method did not apply in a situation where a dissenting shareholder in a closely held corporation was being bought out by a majority stockholder." *Institutional Equipment*, 204 Ill. App. 3d at 930.

What Schweisberger fails to recognize is that the court in *Institutional Equipment* made those comments while considering the propriety of the trial court's rejection of an illiquidity discount *at the shareholder level* based on the lack of an open market for the shares. See *Institutional Equipment*, 204 Ill. App. 3d at 930. The reviewing court found that the trial court did not err in rejecting the shareholder level discount, because the discount amounted to a fair market valuation of only the dissenters' shares. *Institutional Equipment*, 204 Ill. App. 3d at 930. Discounts at the shareholder level are generally disallowed because they result in undervaluing the dissenters' shares while overvaluing the majority's shares, thereby effectively punishing the minority shareholder for exercising his or her statutory right to dissent. See *Cavalier Oil Corp. v. Harnett*, 564 A.2d 1137, 1145 (Del. 1989). Schweisberger has flipped the holding in *Cavalier Oil* on its head and is seeking to punish the majority shareholders for exercising their statutory right to prevail. As previously explained, the deduction that must be taken in the present case is at the *corporate level* and properly measures the true, intrinsic value of *all* the shares in the corporation, including Schweisberger's, as a going concern immediately before the closing on the sale of the building. See *Pueblo Bancorporation*, 63 P.3d at 360, 364. Accordingly, Schweisberger's reliance on *Institutional Equipment* is misplaced, and we do not find the case persuasive.

Schweisberger next relies on *Hansen*, 1998 MT 77, 288 Mont. 310, 957 P.2d 32, *Perlman*, 568 F. Supp. 222, *Glosser Brothers*, 382 Pa. Super. 177, 555 A.2d 129, and *Trapp Family*, 169 Vt. 82, 725 A.2d 927, in support of his argument that deducting the capital gains taxes, professional fees, and other costs associated with the sale of the build-

ing would inappropriately amount to a calculation of value under the "liquidation" premise of value rather than the proper "going concern" premise of value. Schweisberger argues that these cases make clear that the tax effects of the corporate action to which a dissenter objects should not be factored into the trial court's calculation of fair value. Schweisberger's reliance on these cases is misplaced.

In discussing the propriety of the trial courts' consideration of tax consequences, all of these courts emphasized the need to value the corporations as "going concerns." See *Hansen*, 1998 MT 77, ¶47, 288 Mont. 310, 957 P.2d 32; *Perlman*, 568 F. Supp. at 232; *Glosser Brothers*, 382 Pa. Super. at 204, 555 A.2d at 142; *Trapp Family*, 169 Vt. at 90, 725 A.2d at 934. As previously detailed, our conclusion that the transaction costs associated with the sale of the building must be deducted from Brynwood's net asset value is predicated upon the unique history and nature of Brynwood and its business, as a going concern, immediately before Brynwood closed on the sale of the building.

That being said, none of the corporations in the cited cases was involved in the sale of all, or substantially all, of its assets after an arm's-length transaction that had been approved by the majority of the shareholders. Rather, in *Hansen*, the corporation effected a like-kind exchange of one ranch for another and intended to continue its ranching operations thereafter. *Hansen*, 1998 MT 77, ¶47, 288 Mont. 310, 957 P.2d 32. In the other three cases, the minority shareholders were being forced out of the corporations when the corporations intended to continue their operations without them. See *Perlman*, 568 F. Supp. at 226; *Glosser Brothers*, 382 Pa. Super. at 181, 555 A.2d at 131; *Trapp Family*, 169 Vt. at 84, 725 A.2d at 930. Accordingly, the interests to be protected and the purposes served by the statutes in the cited cases were different from those in the present case. See *Hunter v. Vercellotti*, 271 Ill. App. 3d 1030, 1036 (1995), citing *S.N. Neilsen Co. v. Public Building Comm'n*, 81 Ill. 2d 290, 298 (1980) ("[R]emedial legislation should be construed liberally to effectuate its purpose[s]"). As we have explained, our conclusion that the transaction costs associated with the sale of the building must be deducted from Brynwood's net asset value properly effectuates the Act's purposes both in protecting Schweisberger, as a dissenting shareholder, and in treating all of Brynwood's shareholders fairly and equitably.

Moreover, because none of the corporations in the cited cases was actually involved in the sale of all, or substantially all, of its assets, the tax consequences asserted by the majority shareholders were theoretical, speculative, and unrealized. See *Hansen*, 1998 MT 77,

¶47, 288 Mont. 310, 957 P.2d 32; *Perlman*, 568 F. Supp. at 232; *Glosser Brothers*, 382 Pa. Super. at 203, 555 A.2d at 142; *Trapp Family*, 169 Vt. at 90, 725 A.2d at 934. Here, by contrast, the capital gains taxes, professional fees, and other costs were known from Brynwood's inception and on the day prior to the sale of the building, and they were actually realized at the time Brynwood closed on the sale of the building on August 7, 2002. As such, they were not only pertinent to the trial court's fair value determination but were also required to be accounted for due to the unique history and nature of Brynwood as a going concern. See *Paskill*, 747 A.2d at 555; *Tri-Continental*, 31 Del. Ch. at 534, 74 A.2d at 76. For all of these reasons, we are unpersuaded by Schweisberger's authorities.

We make one final note regarding the propriety of deducting costs and expenses from Brynwood's net asset value in coming to a fair value determination. We are mindful that the parties do not differentiate between the capital gains taxes, professional fees, and other costs incurred as a necessary result of the shareholders realizing their investment value in Brynwood on the one hand, and the expenses incurred in dissolving the corporation, on the other. Rather, the parties treat all of these expenses as one lump sum, to be included or excluded, *in toto*, by the trial court in determining fair value. These expenses should not be treated alike.

Section 11.70(d) of the Act describes the moment the rights and liabilities between the dissenting shareholder and the corporation change:

> "A shareholder who makes written demand for payment under this Section retains all other rights of a shareholder until those rights are cancelled or modified by the consummation of the proposed corporate action. Upon consummation of that action, the corporation shall pay to each dissenter \*\*\* the amount the corporation estimates to be the fair value of the shares, plus accrued interest \*\*\*." 805 ILCS 5/11.70(d) (West 2002).

As this provision makes clear, the "consummation" or the completion of the corporate act cancels or modifies the dissenter's rights as a shareholder in the corporation and correspondingly triggers the corporation's legal obligation to pay the dissenter the fair value of his or her shares, in addition to accrued interest. See 805 ILCS 5/11.70(d) (West 2002); Black's Law Dictionary 335 (8th ed. 2004) (defining "consummation" as the act of bringing something to "completion" or "to fulfill"). In the present case, Schweisberger's status as a Brynwood shareholder was extinguished on August 7, 2002, upon the consummation of the corporate act to which he dissented, *i.e.*, as of the date of the closing on the sale of the building. See 805 ILCS

5/11.65(a)(2) (West 2002); *West Shore Associates, Ltd. v. American Wilbert Vault Corp.*, 269 Ill. App. 3d 175, 178 (1994). Therefore, the costs associated with Brynwood's dissolution and the winding up of Brynwood's corporate affairs should not be taken into account in determining the fair value of Schweisberger's shares, as they were clearly incurred after the closing on the sale of the building and after Schweisberger had severed his relationship with Brynwood. See *Paskill*, 747 A.2d at 555. Further, we note that a portion of the $446,593 in capital gains taxes, professional fees, and other costs associated with the sale of the building and the dissolution of the corporation were incurred for the preparation of the June 30, 2002, year-end statements and income tax returns. As Schweisberger clearly was a shareholder at the time these fees were incurred, they should appropriately be deducted from Brynwood's net asset value upon remand.

To summarize then, on remand, the trial court should conduct a new business valuation of Brynwood as a going concern to determine Brynwood's fair value pursuant to section 11.70 of the Act. The trial court should deduct the transaction costs, *i.e.*, the capital gains taxes, professional fees, and other costs directly related to the sale of the building. The trial court should also deduct taxes, fees, and costs incurred while Schweisberger was a shareholder of the corporation. Taxes, fees, and costs incurred after the closing on the sale of the building on August 7, 2002, should not be calculated in Brynwood's true, intrinsic net asset value, as Schweisberger's status as a shareholder was extinguished on that date. The trial court should then determine the fair value of Schweisberger's shares by calculating his proportional interest in Brynwood's true, intrinsic net asset value. In this way, the trial court will effectuate the purposes of the Act.

Brynwood's final argument regarding the trial court's fair value determination relates to statutory interpretation and the priority of creditors' claims upon the dissolution of an Illinois corporation. Our resolution of the previous issue obviates the need to address this argument. See *Barth v. Reagan*, 139 Ill. 2d 399, 419 (1990) (stating, "[r]eviewing courts will not decide moot or abstract questions or render advisory opinions. Courts of review also ordinarily will not consider issues where they are not essential to the disposition of the cause or where the result will not be affected regardless of how the issues are decided"). We, therefore, decline to engage in a discussion of this issue.

■ Brynwood's last argument concerns the trial court's determination of the interest rate to be paid by Brynwood to Schweisberger pursuant to sections 11.70(h) and 11.70(j)(2) of the Act (805 ILCS 5/11.70(h), (j)(2) (West 2002)). Brynwood argues that, because its

mortgage had been paid in full at the time it was required to begin paying interest to Schweisberger, the trial court should have determined an interest rate that was "fair and equitable under all the circumstances," rather than automatically adopting the 6.75% interest rate that Brynwood had previously paid on its mortgage to Alpine Bank. Brynwood asserts that a fair and equitable rate would have been 2.3%, the rate it was earning on the proceeds of the sale of the building, which proceeds had been deposited in a certificate of deposit.

Having vacated the trial court's judgment because its determination as to the fair value of Schweisberger's shares was against the manifest weight of the evidence, we necessarily vacate the trial court's determination as to the interest rate to be paid by Brynwood to Schweisberger. However, in the interest of judicial economy and in an effort to resolve the parties' dispute, we address Brynwood's contention only to the extent that it may assist the trial court on remand. See *Clayton v. County of Cook*, 346 Ill. App. 3d 367, 378 (2003) (stating that the most important function of a court of review is to provide direction to the trial court as to how to address issues that are likely to arise on remand).

Section 11.70(h) of the Act provides that a dissenting shareholder is entitled to interest if the court determines that the fair value of his or her shares exceeds the estimated fair value paid by the corporation at the time of the dissent. 805 ILCS 5/11.70(h) (West 2002). "Interest" is defined in section 11.70(j)(2) of the Act as follows:

" 'Interest' means interest from the effective date of the corporate action until the date of payment, at the average rate currently paid by the corporation on its principal bank loans or, if none, at a rate that is fair and equitable under all [of] the circumstances." 805 ILCS 5/11.70(j)(2) (West 2002).

The plain language of section 11.70(j)(2) provides that interest accrues from "the effective date of the corporate action" until the date of payment. 805 ILCS 5/11.70(j)(2) (West 2002). Section 11.65(a)(2) of the Act describes the corporate action as the "consummation of a sale *** of all, or substantially all, of the property and assets of the corporation other than in the usual and regular course of business." 805 ILCS 5/11.65(a)(2) (West 2002). Therefore, the plain and ordinary meaning of the phrase "the effective date of the corporate action" clearly and unambiguously indicates that the legislature intended that "interest," as defined in section 11.70(j)(2) of the Act, means that interest accrues from the date upon which the corporate act was accomplished or fulfilled until the date it is paid (see Black's Law Dictionary 335 (8th ed. 2004)).

In the present case, then, if the trial court on remand finds that the fair value of Schweisberger's shares exceeds the estimated fair value paid by Brynwood at the time of the dissent (see 805 ILCS 5/11.70(h) (West 2002)), Schweisberger will be entitled to a judgment for interest (see 805 ILCS 5/11.70(j)(2) (West 2002)). Interest should be calculated from August 7, 2002, when Brynwood and Lipe closed on the sale of the building. See 805 ILCS 5/11.70(j)(2), 11.65(a)(2) (West 2002). When that transaction was accomplished, Brynwood had paid its mortgage in full and no longer had principal bank loans that would dictate the interest rate to be paid by Brynwood to Schweisberger. Therefore, on remand, the trial court may exercise its discretion in determining a rate of interest that is fair and equitable under all of the circumstances. See 805 ILCS 5/11.70(j)(2) (West 2002). The rate of interest should fall within the range of the statutory and prime interest rates in effect at the time of the completion of the corporate act on August 7, 2002. See *Weigel Broadcasting*, 289 Ill. App. 3d at 612 (holding that, where the trial court was to award a rate of interest that was fair and equitable under all of the circumstances, it was within the trial court's discretion to award a fair and equitable interest rate between the statutory rate and the prime rate).

For the foregoing reasons, we vacate the judgment of the circuit court of Winnebago County and remand for further proceedings consistent with this order.

Vacated and remanded.

McLAREN and SCHOSTOK, JJ., concur.